# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 1, 2014

Lyle W. Cayce
Clerk

No. 10-70028

DONALD KEITH NEWBURY,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before STEWART, Chief Judge, and JOLLY and PRADO, Circuit Judges.

PER CURIAM:

Donald Keith Newbury was convicted of capital murder and sentenced to death for his role in the murder of Irving, Texas, police officer Aubrey Hawkins. The Texas Court of Criminal Appeals (TCCA) affirmed Newbury's conviction and death sentence on direct appeal. In his state habeas application, Newbury argued that his trial counsel rendered ineffective assistance by failing to investigate and present school, medical, and counseling records at the punishment phase of his trial. The TCCA denied state habeas relief, adopting the trial judge's findings and conclusions.

No. 10-70028

The district court granted federal habeas counsel's pre-petition request for $7,500 to retain a licensed social worker as a mitigation specialist, but denied his request for additional funds for a clinical psychologist that Newbury claimed was necessary to evaluate and issue an opinion on the psychological issues uncovered in the mitigation investigation. In his federal habeas petition, Newbury again claimed that his trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence. In addition to the school, medical, and counseling records presented in the state habeas proceeding, Newbury argued that trial counsel should have investigated and discovered the mitigating evidence described in the affidavit of the mitigation specialist. He argued that the evidence presented for the first time in federal court was not presented in state court because of the "miserable performance" of his state habeas counsel.

The district court denied relief on the portion of Newbury's ineffective assistance of trial counsel (IATC) claim that relied on the evidence presented in state court. It held that the portion of the IATC claim that relied on new evidence presented for the first time in federal court was unexhausted and procedurally barred. In the alternative, it held that even if the unexhausted evidence were considered, Newbury's IATC claim failed on the merits. The district court denied a certificate of appealability (COA).

We denied Newbury's request for a COA in July 2011. *Newbury v. Thaler*, 437 F. App'x 290 (5th Cir. 2011). We held that Newbury's IATC claim based on the new evidence presented for the first time in federal court was procedurally barred. *Id.* at 295 n.2. We did not address the district court's alternative holding that the claim lacked merit. *Id.*

The Supreme Court vacated and remanded for further consideration in the light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). *Newbury v. Thaler*, 132 S. Ct. 1793 (2012). On remand, we again denied a COA, relying on our

## No. 10-70028

precedent holding that *Martinez* does not apply to Texas cases. *Newbury v. Thaler*, 481 F. App'x 953 (5th Cir. 2012). On June 3, 2013, the Supreme Court vacated and remanded for further consideration in the light of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). *Newbury v. Thaler*, 133 S. Ct. 2765 (2013). After such further consideration, we once again deny Newbury's request for a COA.

### I.

### A.

Newbury and six other inmates (referred to as "the Texas Seven")[1] escaped from a Texas prison and committed a series of armed robberies. Officer Hawkins was shot and killed as the group fled the scene of a robbery at a sporting goods store in Irving, Texas. Newbury and the others (except one who committed suicide) were eventually arrested in Colorado. Newbury confessed to his role in the escape and robbery and blamed poor police training for Officer Hawkins's murder.

The state trial court appointed Doug Parks and Kevin Brooks to represent Newbury at trial. Parks had been involved in over 12 death penalty trials. The record reflects that the state trial court granted defense counsel's ex parte motion for the appointment of a neuropsychologist. The record does not indicate whether that expert examined or evaluated Newbury, and the expert did not testify at trial.

The State introduced the following evidence at the punishment phase. Newbury had three prior convictions for aggravated robbery: one in 1981 for which he received a ten-year prison sentence; one in 1987 for which he received a 15-year prison sentence; and one in 1998 for which he received a 99-year

---

[1] The other members of the Texas Seven are George Rivas, Patrick Murphy, Michael Rodriguez, Joseph Garcia, Randy Halprin, and Larry Harper.

prison sentence. He used a gun in all three of the robberies. After his escape from prison, Newbury and another escapee committed two armed robberies in Houston during which store employees were bound and threatened with death. All seven of the escapees then participated in the armed robbery of the sporting goods store and the murder of Officer Hawkins.

Patrick Moczygemba described the circumstances of the Texas Seven prison escape. On December 13, 2000, six of the seven escapees were working under Moczygemba's supervision in the maintenance department at the Texas Department of Criminal Justice (TDCJ) Connally Unit. One of the escapees hit Moczygemba in the head, and he lost consciousness. When he regained consciousness, one of the escapees was holding a shank to his head. After stealing Moczygemba's clothing, the escapees bound and gagged him and placed him in a room where they eventually brought 13 other bound prison employees and inmates. Moczygemba stated that all seven of the escapees actively participated and had a role in the escape.

Alejandro Marroquin, another Connally Unit employee, testified that, on the day of the escape, he was surrounded by six escapees, including Newbury, and knocked down by a blow to his head. Newbury held a shank with a 12-inch blade to Marroquin's throat while another escapee threatened him with death if he resisted. The escapees ordered Marroquin to crawl to the room where the other hostages were being held, and Newbury and another escapee kicked him from behind as he crawled to the room. The escapees bound him and then attempted to gag him. When Marroquin resisted the gag, Newbury hit him three or four times with his bare fist until Marroquin lost consciousness. Other prison employees' testimony described similarly Newbury's actions during the escape.

The State presented additional evidence of Newbury's violence while previously incarcerated. John Keller, a former correctional officer at the Travis

No. 10-70028

County Jail, testified that in 1981, Newbury participated with two other inmates in a coordinated attempt to escape. During the escape attempt, Newbury grabbed Keller and held a broken fluorescent tube to Keller's throat. While imprisoned between 1981 and 1985, and again between 1987 and 1988, Newbury received 15 disciplinary reports, including 11 charges for fighting without a weapon.

Newbury's counsel presented mitigating evidence through testimony from Newbury's sister and father, the only surviving adult members of his family. His father testified that he traveled frequently for his job and was only at home a few days a month during Newbury's childhood. He admitted that he was a heavy drinker and was not a very good father. He stated that although he provided for his family financially, he did not provide emotional support. When Newbury was about 12 years old, his mother divorced his father and moved to Texas, after which Newbury had very little contact with his father. Newbury's mother died in mid-2001. On cross-examination, Newbury's father testified that Newbury was punished when he did wrong, had clothes and food, and was given love by his parents. He denied ever abusing Newbury, physically or mentally. He was not aware that Newbury ever suffered from any mental problems; instead he seemed like a normal boy growing up. In response to a question by the prosecutor, he admitted that Newbury was involved in a shooting incident with a neighbor boy. He testified that he visited Newbury a couple of times in the penitentiary, but Newbury removed him from the visitors list because they had a difference of opinion about religion.

After the father testified, defense counsel tried to introduce photographs of Newbury to show that his family provided for him, and that he did not come from a bad home or a financially deprived home. The State objected to the photographs, and the court ruled they were inadmissible.

5

No. 10-70028

Newbury's sister, Lesa Flores, testified as follows. She is 20 months older than Newbury. When she was four, the family moved to a mobile home park in Missouri, where they lived for about ten years. Her father traveled frequently for his job. She and Newbury were raised primarily by their mother and grandmother. Their mother died about a year before trial, and their grandmother had been dead for "some years." Newbury was very active and had a hard time sitting still for class when he was in elementary school. He was placed on Ritalin. From kindergarten through third grade, she sometimes had to help his teachers take him back to his classroom when he wanted to go out and play. Other than that, he appeared to be a pretty normal, active child. Their parents did not get along with each other and got into physical altercations in front of the children. Her father once dragged her mother upstairs by the hair in front of them. Their parents separated when she was 14 and Newbury was 12. She, her mother, and Newbury moved to Texas. She and Newbury both dropped out of school without graduating. When Newbury was about 16, he went to stay with their father in Arkansas for six months or so. Newbury had a good relationship with her children. He was 18 when he got into trouble and was sent to the penitentiary. He attended the birth of her oldest daughter, Ranna, who was present in the courtroom when she testified. When they were growing up their parents tried to teach them right from wrong. Her father would spank her and Newbury with a very thick leather belt when they misbehaved. Their mother would discipline them by sending them to their room or an occasional spanking by hand. She was not aware that her father drank alcohol except very rarely when they had a party.

Their grandmother, who watched them while their mother was at work, physically and emotionally abused them. She "despised" and "completely shunned" Newbury and favored Flores. She gave Christmas gifts to Flores, but not to Newbury. She picked up any object light enough to use as a weapon

6

and hit Newbury with it. She broke their toes "quite frequently," particularly when Flores interfered with fights between her and Newbury. The abuse continued until Newbury was 15 or 16 years old.

Defense counsel asked Flores about the incident in which Newbury's friend, Greg Scott, was shot. Flores testified that she was in the kitchen and heard something that sounded like a hard pinging noise coming from the cement utility room, where Newbury and his friend had her boyfriend's gun. Then Newbury and Scott came into the kitchen, saying, "He's been shot." She said that her father had given permission for her boyfriend to teach Newbury to hunt. Flores did not see the gun fired. Scott was shot in the arm and the abdomen, but only one shot was fired. He was taken to the hospital with some major internal damage, but he survived. She stayed at the house to take care of Newbury and Scott's little sisters, and all of them were in shock.

Flores testified that she continued to have a close relationship with Newbury after he was released from the penitentiary, that he lived with her for about a year after being released from the penitentiary the second time, and that he was an extremely hard worker.

On cross-examination, Flores testified that their mother gave Newbury presents at Christmas and for his birthday. She said that Newbury was treated with Ritalin for his hyperactivity as a child but that, despite his learning disorders, his intelligence was fine, he had job skills, and worked well with his hands. She also acknowledged that their mother took him to see doctors and they received family counseling in an effort to help him.

Newbury's 20-year-old stepson, Larry Jones Washington, Jr., testified that Newbury had had a positive impact on his life and had helped him turn his life around after he got into trouble for theft and possession of an illegal substance when he was a teenager. Newbury's 18-year-old stepdaughter, Marquita Washington, testified that Newbury was like a father to her and had

warned her after she got in trouble at school that she could end up in prison like he had if her bad behavior continued. Newbury's 15-year-old stepdaughter, Andrea Washington, testified that he treated her like his child and talked to his stepchildren about right and wrong, telling them that he had been in jail for doing wrong things and did not want the same for them. All three stepchildren testified that Newbury was a positive influence on their mother when he was with her, but that since his incarceration she had resumed a lifestyle of heavy drinking and drug use.

Newbury's wife, Jackie Newbury, testified that he married her even though he knew she had five children and had been diagnosed with AIDS. Prior to their marriage, while Jackie was incarcerated, Newbury anonymously gave money and most of his own furniture to Jackie's mother and children after their house burned. Although Jackie and Newbury fought over her drug and alcohol abuse problems during their marriage, he eventually helped her quit using drugs, reduce the amount of alcohol she drank, and improve her relationships with her children and her mother. Newbury did not drink or use drugs, worked hard to provide for the family, and was a good influence on her children and did the best he could to be a good father to them. She had never observed him to have any mental problems.

Keith Price, warden of the TDCJ Clements Unit, described the layout, conditions of confinement, and security measures available in maximum security prisons. He testified that if sentenced to life imprisonment, Newbury would start out in the most restrictive administrative segregation level possible, and that the level of security would be lowered only if he followed the rules. Even then, Newbury likely would remain in administrative segregation – 23 hours a day in a one-person cell – for "many, many years." Price also testified that Texas had upgraded prison security significantly since the Texas Seven escape.

No. 10-70028

Outside the presence of the jury, the trial court addressed Newbury regarding the voluntariness of his decision not to testify. When asked if he was satisfied with his attorneys' representation, Newbury said that he was "very satisfied" and had no complaints. When asked if there was any stone that had not been turned over on his behalf, Newbury replied, "I believe all the stones have been turned and returned and turned again."

The jury answered the special punishment issues in a manner requiring imposition of the death penalty. The TCCA affirmed Newbury's conviction and sentence on direct appeal.

B.

Newbury's state habeas application included a claim that his trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence at the punishment phase of trial. Specifically, he alleged that trial counsel should have discovered and presented elementary school records reflecting Newbury's performance between kindergarten and third grade, medical records from his childhood physician, Dr. William Legg, and his 1974 counseling records from a mental health center. He argued that these records would have shown that he had suffered from learning problems, low self-esteem, a medical condition that made him sensitive to weather changes, a tendency to burst blood vessels during times of emotional stress, and difficulties with his father.

The state habeas trial court found that trial counsel adequately and reasonably investigated Newbury's family, medical, and educational background and did not deprive him of a fair trial by failing to introduce the incomplete and inconclusive medical and educational records attached to his writ application. The court noted that counsel presented six character witnesses to testify about Newbury's family, medical, and educational history, and that their testimony included nearly all of the information contained in

9

the documents attached to the writ application, as well as the additional information about Newbury's physical and emotional abuse by his grandmother, which is never mentioned in those documents. Counsel also presented a prison expert to discuss the new security measures under which Newbury would be incarcerated. The court concluded that the jury was given an accurate, if general, picture of the difficulties Newbury had in elementary school, and that counsel reasonably could have decided not to present the school records because they were redundant or because, while they show that Newbury had a difficult time succeeding in school, the records also placed the responsibility on Newbury for his poor attitude and work habits. The court also noted that the school records indicate that Newbury has an IQ of 106, which tends to undermine any sympathy that poor school performance might have evoked in the jury. The court found that Dr. Legg's records were not available for defense counsel to find at the time of trial because they were destroyed when Dr. Legg retired in 1999. The court concluded that considering the double-edged nature of the other information in the school and counseling records, defense counsel reasonably could have decided that the records, on the whole, would provide little or no benefit to the defense. The court concluded that the medical and school records (to the extent they existed and were available) would have added little, if any, support to the defense case at punishment and possibly could have harmed Newbury.

Alternatively, the state habeas trial court held that Newbury had failed to demonstrate prejudice because there is no probability sufficient to undermine confidence in the verdict that a reasonable juror would have concluded that the death penalty was not an appropriate punishment, based upon the information contained in the school and medical records. The court noted that the jury heard most of the information contained in the records through live witness testimony. The court acknowledged that the jury did not

learn that the school principal's notes reflect that Newbury had some unidentified medical condition that made him susceptible to weather conditions such that he could not be outside, but pointed out that Newbury did not assert that the condition continued through his adult years. The court concluded that the records would have added very little, if anything, to the large body of mitigating evidence that the jury heard, and they are insufficient to overcome the weight of the State's evidence of future dangerousness, which Newbury admitted was overwhelming. The TCCA adopted the trial judge's findings and conclusions and denied state habeas relief.

## C.

### 1.

Prior to filing his federal habeas petition, Newbury requested, and the district court granted, $7,500 for a mitigation expert to investigate and prepare a claim that trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence at the punishment phase of his trial. After the mitigation specialist completed her investigation, Newbury's counsel requested an additional $2,500 for a clinical psychologist to evaluate the information collected by counsel and the mitigation specialist and issue an opinion on the psychological issues uncovered by the mitigation investigation. The district court denied that request. The court stated that Newbury had not offered any reason why there is a need for additional funding so that another person could review the work of the court-funded mitigation specialist. Further, Newbury did not explain why the funds were necessary to provide fair compensation for services of an unusual character or duration, as required by 18 U.S.C. § 3599(g).[2]

---

[2] That section states, in pertinent part:

No. 10-70028

2.

In his federal habeas petition, Newbury alleged that trial counsel rendered ineffective assistance by failing to investigate Newbury's background "for mitigation evidence, including but not limited to educational records, medical records and social history." In addition to the evidence presented in the state habeas proceedings, Newbury argued that trial counsel performed deficiently by failing to discover and present mitigating evidence described in the affidavit of the mitigation specialist, Maxwell, as well as by failing to hire an expert who could recognize Newbury's "various emotional and psychological problems." The attachments to the federal habeas petition include Maxwell's report, two affidavits from Newbury's sister, Newbury's affidavit, photographs of Newbury with various family members, and prison and court records.[3] Much of the information in Maxwell's report comes from the affidavits of Newbury and his sister. Maxwell also asserted that an expert would have testified that Newbury suffered from a number of physical and psychological syndromes and could explain how his personality and life choices were negatively shaped and influenced. The conditions identified by Maxwell include: sensory integration disorder, attachment disorder, post-traumatic stress disorder, severe learning

---

Fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under subsection (f) shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court . . . as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit.

18 U.S.C. § 3599(g)(2).

[3] The family photographs depict Newbury as an infant being held closely by his mother and sister. There are two photographs of Newbury as an infant being held by his grandmother.

disability, attention deficit and hyperactivity disorder, and depressive neurosis (now called dysthymia).

Newbury alleged in his federal habeas petition that the following evidence was never developed by trial counsel:

Life History:  Newbury was a late term child.  He did not like to be touched.  Because his sister would not leave him alone, he became increasingly aggressive toward her.  He was tongue-tied and could not speak clearly.[4]  He could not tolerate temperature change or strong lights.  Dr. Legg said he needed to stay at home and have a teacher come to his house, but the school refused.  At age eight when he had his tonsils removed, the doctor clipped his tongue, and he had to learn to speak all over again.  He was placed on Ritalin in the third grade.

Emotional Problems:  He did not cry when he was an infant because he hated being touched and was not comforted by being picked up and held.  His mother felt rejected and turned over the care of her infant son to his two-year-old sister.  He was not allowed to suck his thumb and thus could not comfort himself.  At age two, when frustrated, he pounded his fists against the source of his frustration.  At age five, he began fighting back against his father and once broke his nose with a head butt.  At age six, terrified of punishment for breaking a window, he attempted to hang himself.  He explained the suicide attempt by saying that he was tired of living.  When the family went to counseling while he was in the fourth grade, he said no one liked him and he didn't like himself.  He had no safe haven at home or at school.  He was accident-prone.  The only real father figure he had was the father of his sister's husband.  His first sexual experience was with a 50-year-old friend of his

---

[4] A note in the counseling records attached to the state habeas application, dated March 11, 1974, states that Newbury's speech was "normal."

mother's.  He tried living with his father at "God's Range" in Arkansas.  They had daily fist fights, and he was asked to leave because of his advances toward the teenaged daughters of people at the camp.

Physical Abuse:  He was frequently beaten by his father with a quarter-inch belt, including the buckle, used as a whip.  His maternal grandmother abused him physically, often twisting his bare toes in an attempt to break them.  She succeeded at least once when she broke two toes.  His father shot him in the arm with "a bunch of bird shot."  His mother beat him using her fists or a 32-ounce glass bottle.

Emotional Abuse:  Newbury witnessed constant physical violence between his mother and father.  His maternal grandmother provoked fights between him and his sister.  The grandmother gave Christmas gifts to his sister, but not to him.  When he developed the mumps at age four, and his grandmother told him that boys died of the mumps, he became listless and wanted to die.

Poverty:  As the relationship worsened between Newbury's parents, his father stopped paying for groceries and clothing for the family.  His grandmother refused to contribute even though she lived with them.  In August 1974, after his parents separated, Newbury moved into a one-bedroom shack with his mother, grandmother, and sister.  There was no refrigerator, and the food stored in the utility room froze.  The family heated the house with two propane heaters that winter.  Later, when Flores and Newbury were teenagers, they lived on snacks and soft drinks and grazed for food and shoplifted at the grocery store.  Newbury was homeless after he moved out of his mother's house at age 16.

School Problems: Newbury was frequently the target of attacks by other children at school.  He was protected by his older sister, which probably encouraged the problems.  He was held back in first grade.  He and his sister

No. 10-70028

wore ill-fitting, old clothing at school which made them targets for ridicule. He had his first good teacher in fourth grade in Parkville, Missouri. She gave him a typewriter, but when he broke his finger, he lost typing class. Six weeks into seventh grade, he dropped out of school.

Inappropriate Parental Modeling: His mother rewarded him for stealing money from his grandmother to supplement their household income. His mother hid him when police chased him for riding his motorcycle without a license. His mother encouraged and assisted him in stealing and later robbing to supplement the family income.

Problems with the Law: He accidentally shot his best friend when he was 12 years old. At age 15, he panhandled at the airport and continued to rob and steal for his mother. When he made a large haul, the family celebrated with candy and cola. When he returned to Texas after staying with his father in Arkansas, Newbury began using a gun to commit robberies. His ambition to be a Green Beret was thwarted by his first adult robbery charge at age 18. He got in a fight in the Travis County Jail, was transferred to a part of the jail housing incorrigible prisoners, and got pulled into an unsuccessful escape attempt. After receiving a ten-year sentence, he was placed in protective custody, where many of the inmates in the unit were homosexuals, and he fought constantly. The first legitimate job he had was as a welder after he was first paroled. When the project ended, the company offered him a position in Arizona, but he lost the job because his parole officer refused to let him transfer his supervision to Arizona. Newbury stopped reporting to his parole officer after a roommate committed a robbery for which Newbury thought he would be accused. Ultimately, he was arrested for the robbery of an auto parts store and went back to prison on a 15-year sentence. After serving five years of the 15-year sentence, he lived with his sister's family and provided for her and her children. His sister had been institutionalized after a suicide attempt. He

15

married Jackie Wright, his wife at the time of trial, and added her and her children to his responsibility. After Newbury's employer was arrested for possession of drugs, his parole officer required him to quit that job, and he began committing robberies again. He was arrested for the robbery of a hotel and received a 99-year sentence, which he was serving when he escaped.

a.

The district court held that trial counsel did not provide ineffective assistance by failing to investigate and present the evidence Newbury relied on as support for his IATC claim in the state habeas proceedings. Because Dr. Legg's records were destroyed when he retired in 1999, the year before the capital murder, trial counsel could not be expected to discover and present evidence that no longer existed. Nor could Newbury show prejudice because the contents of the records are unknown.

Because Newbury did not present any evidence of counsel's decision-making process regarding the school and counseling records, the district court held that he had not overcome the presumption of reasonableness. The district court noted that Newbury had not pointed to any obvious leads counsel failed to pursue that would have generated substantial new evidence of a type not introduced at trial. The district court concluded that, given the substantial evidence already available to them, counsel reasonably may have ceased their investigation before gathering the records; or, counsel may have had access to the records and decided not to introduce them because the additional evidence in the records was either cumulative of trial testimony, insignificant, or detrimental to Newbury's case.

The district court held that even if counsel rendered deficient performance in not discovering and presenting the school and counseling records, Newbury was not prejudiced. In state court, Newbury argued that the teachers' notations and comments in the school records would have shown he

16

suffered from learning problems as a child. According to the district court, the teachers' comments would have been cumulative of Newbury's sister's trial testimony that his hyperactivity interfered with his schoolwork between kindergarten and third grade, and that he was placed on Ritalin for this "learning disorder." Moreover, the teachers' comments could have been damaging, because they stress his negative attitude and lack of interest in school rather than a learning disability over which he had no control. In addition, the school records contain IQ test scores of 106 and 91. The district court concluded that, rather than garnering sympathy for Newbury, the IQ scores and teachers' comments would have left the jury with the impression that, as in his adult life, he chose to defy authority at a young age instead of working to develop his skills and abilities.

Newbury also argued that the school records would have been helpful because they contain a note signed by the principal documenting a telephone conversation with Dr. Legg in December 1968, when Newbury was six years old, in which Dr. Legg apparently said that Newbury suffered from "a rare and very critical condition in which he cannot tolerate changes of temperature, low temperature, high humidity, windy conditions, etc." and "does burst blood vessels during emotional stress situations." The district court noted that in Dr. Legg's affidavit presented to the state habeas court, he stated that he has no independent recollection of Newbury's condition and that the comment that blood vessels burst meant only that Newbury's face turned red in stressful situations. The district court concluded that, particularly in the light of Dr. Legg's clarification, the notation would not have helped Newbury if it had been presented to the jury. The court also pointed out that there is no evidence that Newbury's inability to tolerate certain types of weather caused any major difficulties or lasted beyond his very early childhood.

The district court concluded that much of the evidence in the counseling records would have been cumulative of Newbury's sister's testimony about his difficulties in school, his hyperactivity and the fact that he was prescribed Ritalin, their father's spankings of Newbury with a thick leather belt and his abuse of their mother; and his father's testimony that he probably was not a very good father, that he was a heavy drinker, that he did not support the family emotionally and was away from home much of the time, and that he had very limited contact with Newbury from the time Newbury was 12 years old.

The district court found that the only potentially mitigating evidence in the school and counseling records that counsel did not explore at trial was the evidence that Newbury felt that no one liked him, including himself, and the fact that he was diagnosed with depressive neurosis during the counseling. The district court observed that feelings of rejection and low self-esteem are not uncommon among adolescents, that the diagnosis of depressive neurosis was secondary to hyperactivity, that the condition did not impair Newbury's judgment, and that his depressed mood was only "moderate." Further, there was no evidence that Newbury suffered from this condition after 1974. The district court pointed out that none of the defense witnesses mentioned that Newbury showed any signs of depression, and his wife testified that she had never observed that he had any mental problems.

The district court also found that the counseling records contained information that would have been harmful to the defense: that Newbury viewed his mother and sister as warm and accepting; that his sister was supportive of him; that his mother was an involved parent who communicated with teachers and initiated family counseling for his benefit; and that his father attended at least two counseling sessions. A statement by one of the counselors that "the family had a tremendous investment in scapegoating the father" might have led the jury to discount the sister's testimony regarding her

18

father's abusive behavior. Perhaps most damaging in the district court's view was the information that was not included in the counseling records: although Newbury's sister testified that the most extreme physical and emotional abuse suffered by Newbury came from his grandmother, who allegedly began mistreating him when he was only three years old, and who lived with the family off and on for most of their lives, the detailed notes of family counseling sessions do not contain a single reference to the grandmother. The district court found that the fact that Newbury evidently never mentioned his grandmother in counseling would have raised doubts about his sister's testimony regarding the grandmother's abuse.

b.

The district court held that it was procedurally barred from considering the new evidence that Newbury presented for the first time in federal court. Alternatively, the court held that Newbury's IATC claim lacked merit even considering the new evidence Newbury offered in support of it.

In her report, mitigation specialist Maxwell stated that she interviewed Newbury's father, his mother-in-law, stepdaughter Marie Smith, stepson Charles Washington, Jackie Cherico (sixth grade teacher), and Joan Jeide (new wife). Because Maxwell did not specify what, if any, information in her report came from those sources, the district court held that, to the extent Newbury argued that counsel should have presented additional testimony from any of those persons, he could not prevail because he had not submitted evidence that they would have been willing to testify to that information at trial.

The district court pointed out that although Newbury's sister claimed in her affidavit that she met with trial counsel only once before trial, in a public area where she did not feel that she could talk about confidential matters, she did not explain in her affidavits what matters she was reluctant to discuss with trial counsel when she met with them, and did not explain why she could not

have conveyed any information she was unwilling to discuss publicly through other means, such as a letter to counsel. Further, there was no evidence that trial counsel was aware or should have been aware of her discomfort during the interview. In any event, counsel's questions to her at trial indicated that she had discussed intimate family details with him before trial. The district court also pointed out that counsel asked Flores a series of broad, open-ended questions, which gave her multiple opportunities to provide mitigating evidence about Newbury's life history and family background.

The district court found that the most compelling new evidence Flores presented was that Newbury attempted to hang himself when he was eight years old. However, the court pointed out that she could have provided that information at trial in response to the questions that defense counsel asked her (i.e., when counsel asked whether Newbury appeared to be a pretty normal, active child, to which Flores responded "Yes").

The district court concluded that the most relevant mitigating evidence offered by Flores in federal court was either redundant of her trial testimony or provided more detail about the topics she testified about at trial. At trial, she described her father's use of a belt to discipline; in federal court, she added the additional details that her father swung the belt buckle at Newbury's head and hit him all over his body with the belt and belt buckle, once pushed his hand into dog excrement, and kicked him in the groin. She testified at trial about their grandmother's emotional and physical abuse of Newbury; in federal court, she added that his grandmother told him he was going to die when he had the mumps. She testified at trial about Newbury's difficulties in school; in federal court, she added that he was retained in first grade and was placed in special education for reading. The district court held that counsel was not deficient for not bringing these extra specifics to light at trial.

20

No. 10-70028

The district court noted that the most specific complaint Newbury made about Flores's testimony is that trial counsel elicited testimony from her that Newbury shot his best friend with a .22 caliber rifle but did not present evidence of his reaction to the shooting or that the shooting was an accident. The district court found that the record did not support these allegations. Flores testified that the two boys were playmates and were alone with the gun in a small utility room, Flores heard a pinging noise coming from the utility room, and both boys came to Flores together and told her, "He's been shot;" and that only one shot was fired that injured the friend in two places. The district court thought it likely that the jury surmised from this testimony that the shooting was accidental and that at least some of the damage was caused by a ricocheting bullet. The court noted that in questioning Flores about the shooting incident, trial counsel deftly avoided revealing the fact that Newbury shot the gun; and he elicited testimony from Flores that Newbury reacted with shock. (Although the district court did not mention it, it was the prosecutor who first brought up the shooting, in his cross-examination of Newbury's father, who testified before Flores testified.) In federal court, Newbury criticized counsel for not presenting the following additional facts regarding the accidental nature of the shooting through Flores's testimony: Newbury thought the gun was not loaded and was showing off for his friend when he shot the gun; the bullet ricocheted off the wall and went through the friend's arm; and Newbury felt horrible about the incident. The district court held that, to the extent Newbury faulted counsel for not bringing to light more specific facts about an event, the claim must fail. Moreover, the court pointed out that if counsel had attempted to present this evidence, it would have been excluded because Flores was not in the room at the time of the shooting and had no personal knowledge.

21

No. 10-70028

With respect to the evidence presented for the first time in federal court in Newbury's affidavit, in which he complained that the private investigator hired by trial counsel only met with him two or three times and only wanted to talk to him about Jesus, the district court held that Newbury did not explain in the affidavit what efforts counsel took to gather mitigating facts from him, whether counsel were aware of the facts presented in his new affidavit or why, if they were not aware of those facts, Newbury did not make them aware. The district court pointed out that counsel presented a substantial mitigation case and, when asked by the trial judge at the conclusion of the punishment phase whether there was any stone that had not been turned over by counsel on his behalf, Newbury replied, "I believe all the stones have been turned and returned and turned again." The district court held that, without any evidence to rebut the presumption of reasonableness to which counsel's strategic decision-making is entitled, it could not conclude that counsel was deficient for failing to investigate and introduce the evidence in Newbury's affidavit. Moreover, Newbury did not explain how counsel could have presented that evidence; Newbury did not testify, and the evidence would have been excluded if counsel had attempted to present it through other witnesses.

Next, the district court addressed Newbury's claim that counsel should have presented expert testimony to explain that his criminal behavior was modeled and reinforced by his parents, and that he suffered from: (1) a severe learning disability; (2) attention deficit and hyperactivity disorder; (3) post-traumatic stress syndrome; (4) attachment disorder; (5) sensory integration disorder; and (6) depressive neurosis (dysthymia).

At the outset of its discussion of this claim, the district court noted that Newbury did not present any evidence regarding counsel's decision-making with respect to the use of a psychological expert. The court stated that expert

22

testimony about Newbury's learning disabilities and hyperactivity would have been cumulative of Flores's testimony about those topics.

The district court observed that Maxwell's diagnosis of post-traumatic stress syndrome is based on the fact that Newbury was subjected to extreme physical abuse by his father and grandmother starting at age three, and the fact that he witnessed violent physical attacks on his mother on a regular basis. The court pointed out that trial counsel elicited testimony from Flores about the grandmother's emotional and physical abuse of Newbury and the father's harsh discipline and abusive treatment of the mother. Although an expert might have been able to retrospectively add the label of post-traumatic stress syndrome to describe Newbury's reaction to these events, the court held that such information would not have added appreciably to the jury's understanding of Newbury's childhood plight and would have essentially been cumulative of Flores's testimony.

The district court found that Maxwell's diagnosis of attachment disorder is premised primarily on Flores's recollection, presented for the first time in her affidavit, that Newbury's mother told Flores, "This is your baby" when Flores was two years old, that Newbury hated to be touched when he was a young child, and that his mother felt rejected by him. The court pointed out that there is no evidence that Flores shared this information with counsel during pretrial interviews or that counsel was to blame if she did not do so. Even if she had shared this information with counsel, counsel reasonably might have doubted her ability to recall events that occurred when she was a two-year-old in the 1960s and reasonably might have concluded that hiring an expert on the basis of such recollections would not have been productive. The court pointed out that none of the evidence that was available to counsel, including the 1974 counseling records, indicated that Newbury was ever

23

diagnosed with attachment disorder before trial. To the contrary, that evidence suggested that Newbury was cared for by an attentive mother.

The district court found that Maxwell's diagnosis of sensory integration disorder was based on a statement in Flores's affidavit about his sensitivity to touch as an infant and the note from Dr. Legg in his school records about his sensitivity to weather conditions. There was no indication that Flores discussed Newbury's sensitivity to touch as an infant with counsel in pretrial interviews or that counsel was to blame for her failure to do so. In any event, the court pointed out that Flores explained in her affidavit that Newbury started growing out of his sensitivity when he was between two and three years old. The district court found that the connection drawn by Maxwell between sensitivity to touch in infancy and later sensitivity to weather conditions at age six seemed tenuous at best, and held that a reasonable attorney might have concluded that a jury would not be persuaded by a post hoc diagnosis premised on such seemingly unrelated bits of data. The court pointed out that nothing in the record, including the 1974 counseling records, indicated that Newbury was diagnosed with sensory integration disorder at any point in his life before Maxwell made her assessment.

The district court found that Maxwell's assessment of depressive neurosis is based on therapy records from 1974, when Newbury was 11 years old, and on earlier incidents. The counseling records indicated that the depressive neurosis was not severe and did not impair Newbury's judgment, and that his depressed mood was only moderate; Flores testified at trial that he was a "pretty normal, active child;" there was no evidence that he suffered from depressive neurosis after age 11; and his wife, who married him in 1994 and lived with him for three years until his 1997 arrest, testified that she had never observed him to have any mental problems.

24

The district court found that the only evidence that Newbury's behavior was modeled and reinforced by his parents came from Newbury's affidavit, in which he claimed that he began helping his father steal equipment when he was eight years old, that his mother rewarded him for stealing from his grandmother before age ten, and that he then began robbing local businesses and turning the money over to his mother, who rewarded him with robbery celebrations when he was 12. The district court held that, in the light of the fact that Newbury was 37 years old at the time of Officer Hawkins's murder and by that point had been sent clear messages by society, through three felony convictions, that armed robbery was wrong, it was not likely that the jury would have absolved Newbury of some responsibility for his crimes because he was just following the example set by his parents. The district court also observed that the evidence supporting the parental modeling theory is double-edged: the jury would have learned that Newbury was trained to be a criminal when very young and committed robberies on a regular basis as a juvenile before progressing to armed robberies, a violent prison escape, and murder as an adult. According to the district court, such information would have cast him as an irremediable felon and would have enhanced the State's case on future dangerousness. The court concluded that, given these obvious strategic reasons for not presenting testimony about negative role models, counsel reasonably could have decided not to retain an expert to present this theory.

The district court held that Newbury's failure to present any evidence of counsel's decision-making with regard to investigation or presentation of prison and court records was fatal to his claim with regard to that evidence. Moreover, those records do not contain any substantial new mitigation evidence. According to the district court, the most significant evidence in those records is the fact that a sergeant at the Travis County Jail, from which Newbury attempted his first escape, believed that he was not a leader in that

attempt.  However, trial counsel presented that fact through live testimony at the punishment phase.

The district court concluded that even if counsel performed deficiently, Newbury failed to show prejudice because all of his mitigating evidence, including that presented at trial and in both the state and federal habeas proceedings, could not overcome the powerful evidence presented by the State. In addition to the State's overwhelming evidence of future dangerousness described by the state habeas court, Newbury led law enforcement officials on a cross-country manhunt for over a month, and twelve loaded firearms were found in his hotel room when he was finally captured.  The court also found that the State presented persuasive evidence of Newbury's moral culpability through his statement to police in which he admitted that the sporting goods store robbery was premeditated and required considerable calculation and planning, and in which he blamed Officer Hawkins's death on poor police training, evincing a lack of remorse.

The district court agreed with the state habeas court's observation that, through testimony from every living adult member of Newbury's immediate family, trial counsel thoroughly explored Newbury's struggles growing up with an absent father, a broken home, an abusive grandmother, and a medical condition of hyperactivity that caused him to have problems in school and at home.  The jury was presented with substantial evidence of his grandmother's physical and emotional abuse of him, including Flores's graphic description of her breaking his toes and hitting him with various objects, and was also aware that his father neglected his family emotionally, drank too much, physically abused his wife in front of his children, and struck his children with a "thick leather belt."  The district court pointed out that none of the documentary evidence counsel could have presented, such as the school or counseling records, contains any evidence of physical abuse or extreme neglect.  The court

concluded that while Flores had presented additional instances of abusive behavior by the father and grandmother in her affidavit, such as when the father pushed Newbury's hand into dog excrement and kicked him in the groin and his grandmother telling him he would die from the mumps, those additional details did not significantly alter the landscape of his family background presented at trial. The court found that Newbury's more detailed description of his father's physical abuse in his affidavit, in which he claimed that his father would hit or beat him with whatever was closest to him, and that he once shot him in the arm with birdshot while disciplining him, was not so shockingly different from the facts presented at trial that it would have altered the jury's view of Newbury's troubled relationship with his father in a dramatic way.

The court noted that it was unclear from Newbury's affidavit how often his mother was physically abusive, beating him with her fists and a glass bottle, but noted that he stated that he was able to keep her from harming him by the time he was 13 years old. The court held that, in the light of the jury's knowledge of more severe and frequent abuse by the grandmother, the evidence of his mother's abuse would not have significantly altered the jury's view of his childhood. Moreover, the court observed that Newbury's claims of physical abuse by his mother were not corroborated by his sister, who testified at trial that her mother disciplined the children by sending them to their room and spanking them by hand, or by the 1974 counseling records, which stated that at age 12, Newbury viewed his mother as "warm and accepting."

The district court noted Newbury's new allegations of poverty but held that even if such testimony had been presented to the jury, there was not a reasonable probability that it would have resulted in a different verdict.

The district court also found that new evidence describing Newbury as having "rage" and a history of fighting, shoplifting, and robbing taxi drivers at

gunpoint at age 17 to help pay his mother's bills would have been harmful to Newbury's case because it would only have reinforced the jury's belief that Newbury was a dangerous person with violent tendencies.

The district court noted that in his affidavit, Newbury admitted he was a reckless child who engaged in wild pranks and stunts like leading the police on motorcycle chases and lighting a friend on fire, that he stole money from his grandmother, that he regularly committed robberies beginning at age 11-12, and that he had a history of violent fighting, even as a child. The district court observed that the overarching theme of most of Newbury's affidavit was his continued unwillingness to accept responsibility for his crimes, as exemplified in the following excerpt from his affidavit:

> I realize now that I put myself at risk trying to help other people. I admit to being a robber. It was the only way I could see to supplement my income. I was a workaholic. I worked all the time. Because I didn't have any education there were only so many jobs I could get. Being a felon didn't help either in the job department. I tried to stay straight every time I came out of prison.
>
> I never hurt anyone in all the robberies I ever did. I am not a murderer. Even though I said that I shot in the direction of what I believed to be an officer in the [sporting goods store] robbery, I didn't shoot to kill. I shot to run him off. I shot way above his head.
>
> I never stole from any one individual. I wouldn't steal from a person. I only stole from businesses or companies. I never hurt anyone and a lot of the time the guns I used didn't even work. I knew they had insurance to cover those kinds of things. I also knew that they would report a lot more money being stolen than actually was. That is just the way those things work.

The district court found that Newbury's lack of remorse for the danger and loss he repeatedly caused society would only have angered a jury that had heard testimony from his terror-stricken victims and was aware of his confession in which he blamed Officer Hawkins's death on inadequate training.

No. 10-70028

The district court concluded that, in sum, counsel presented a thorough case for mitigation, focusing on traumatic events in Newbury's childhood, emphasizing the positive influence he had on his stepchildren and wife, and pointing out the heightened security he would be under if given a life sentence. The court held that the evidence Newbury claimed counsel should have presented would not have fundamentally altered the portrait of his life presented to the jury and very well might have undermined the defense's attempts to cast him in a positive light. Weighing the State's powerful evidence of future dangerousness and moral culpability against Newbury's far weaker mitigation evidence, the court held that it was unpersuaded that any juror would have answered the mitigation special issue differently if the omitted evidence had been presented.

The district court denied federal habeas relief and denied a COA.

3.

On July 14, 2011, we denied Newbury's request for a COA. 437 F. App'x at 292. With respect to the evidence presented in the state habeas proceeding, we agreed with the district court that trial counsel did not perform deficiently. *Id.* at 296. We held further that Newbury failed to demonstrate that he was prejudiced by counsel's performance because the State presented a strong, if not overwhelming, case of Newbury's future dangerousness. *Id.* at 297. We concluded that Newbury had failed to demonstrate a reasonable probability that, but for counsel's failure to offer the additional evidence from school, medical, and counseling records, the outcome of the trial would have differed. *Id.* Therefore, we held that reasonable jurists would not debate the district court's rejection of the claim.

Although we noted the district court's alternative ruling on the merits with respect to the new evidence that Newbury presented for the first time in federal court, we stated that we did not need to address the district court's

analysis of that evidence because Newbury's new claims, supported by new factual evidence, are procedurally barred. *Id.* at 295 n.2. We pointed out that our review of Newbury's petition under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits," citing *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2012). *Id.* at 297 n.4. We rejected Newbury's contention that the ineffectiveness of his state habeas counsel in failing to present the expanded claim constituted cause to overcome his procedural default. *Id.* at 295 n.3.

On March 26, 2012, the Supreme Court vacated our judgment and remanded the case for further consideration in the light of *Martinez v. Ryan*. 132 S. Ct. 1793. In *Martinez*, the Supreme Court held that a habeas petitioner may establish cause to excuse a procedural default as to an IATC claim by showing (1) that his state habeas counsel was constitutionally deficient in failing to include the claim in his first state habeas application, and (2) that the underlying IATC claim is "substantial", meaning that it has "some merit." 132 S. Ct. at 1318. We ordered supplemental briefing on *Martinez* and *Ibarra v. Thaler*, 687 F.3d 222 (5th Cir. 2012) (holding that *Martinez* does not apply to Texas cases). On July 26, 2012, we issued an opinion holding that, in the light of *Ibarra*, *Martinez* did not affect our previous decision. 481 F. App'x at 955. We therefore denied Newbury's request for a COA.

On June 3, 2013, the Supreme Court vacated our judgment and remanded the case to us, again, for further consideration in the light of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). 133 S. Ct. 2765. *Trevino* overruled *Ibarra* and held that *Martinez* applies to Texas cases because "the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. We

No. 10-70028

granted the parties' joint motion to file supplemental briefing. We now turn to address the arguments of the parties.

## II.

Newbury argues that the district court erred in holding that the new evidence he presented for the first time in federal court is unexhausted and procedurally barred. He contends further that, in the light of *Martinez* and *Trevino*, the district court erred in holding that ineffective assistance of state habeas counsel cannot establish cause to excuse state habeas counsel's failure to present that evidence in state court. Newbury interprets *Martinez* to require the district court to provide funds for the development of both his IATC claim and his claim that state habeas counsel rendered ineffective assistance, prior to assessing the merits of his IATC claim. He therefore contends that the district court's alternative ruling on the merits of his IATC claim, including the evidence he presented for the first time in federal court, is flawed because the district court made that ruling without allowing him the additional resources necessary to develop the facts to support the claim. He asks that we grant a COA, vacate the district court's decision on the IATC claim, and remand the case to the district court for the process he contends is required under *Martinez*.

The State counters that we should not remand to the district court for further review, but should deny a COA without remanding. Although the State argued in the district court that Newbury's IATC claim, to the extent it relies on the new evidence presented for the first time in federal court, is unexhausted and procedurally barred, the State now argues that Newbury's IATC claim *is* exhausted, because it was raised and rejected on the merits by the state habeas court. The State's argument relies on a distinction between an IATC claim raised for the first time at the federal habeas level, and an IATC claim raised in state court that is supplemented in federal court with new, but

previously discoverable, evidence. The State contends that the former is subject to the procedural default doctrine, and the equitable exception established in *Martinez* and *Trevino*, while the latter is subject to the AEDPA relitigation bar and *Pinholster*'s requirement that federal review of the claim be limited to the evidence that was presented in state court. The State contends that *Martinez* and *Trevino* did not overrule *Pinholster*.

The State maintains that the equitable problem at issue in *Martinez* does not exist in Newbury's case because Newbury's state habeas counsel raised an IATC claim, and the state court rejected that claim on the merits. The State contends that *Martinez* does not allow consideration of ineffectiveness of state habeas counsel as cause to excuse the default of *new evidence* to support a *claim* that has previously been raised and rejected on the merits in state court. The State thus contends that because the TCCA adjudicated Newbury's IATC claim on the merits, Newbury's attempt to use new, unexhausted evidence to support his IATC claim in federal court is barred by *Pinholster*.

Alternatively, the State argues that if the claim is procedurally barred, Newbury is not entitled to any relief under *Martinez* and *Trevino.* First, the State contends that he has not shown that his state habeas counsel rendered ineffective assistance because counsel presented an IATC claim, supported by evidence, in the state court. Second, the State argues that *Martinez* and *Trevino* do not require a district court to allow evidentiary development of IATC claims in federal court. According to the State, a holding that a petitioner who qualifies for federal consideration of the merits of his IATC claim under *Martinez* is also entitled to evidentiary development of the claim in federal court would require another equitable exception – to § 2254(e)(2). That section states that where a habeas petitioner has failed to develop the factual basis of his claims in state court, he is precluded from further factual development in federal court unless he can satisfy the statutory exceptions set

out in § 2254(e)(2) by alleging a newly created constitutional right or newly discovered facts.  The State contends that Newbury cannot meet the first requirement because *Martinez* stated that the equitable exception it created did not create a new constitutional right.  Nor do Newbury's claims rely on a factual predicate that could not have been previously discovered through the exercise of due diligence: the fact that Newbury now claims that state habeas counsel should have presented this evidence in the state habeas proceedings necessarily constitutes an admission that the evidence was available at that time.  The State contends that because any lack of diligence on the part of state habeas counsel in developing the factual basis for a claim constitutes a failure sufficient to trigger the restrictive requirements of § 2254(e)(2)(A)(ii), evidentiary development is now foreclosed in federal court.

The State argues that the district court had sufficient facts before it to reach a decision on the merits of Newbury's claim, and did not abuse its discretion by refusing to allow additional funds for the appointment of another expert.  The State also contends that *Martinez* and *Trevino* do not require a district court to provide funds for further factual development of IATC claims but, even if they do require such funding, the district court provided $7,500 for additional factual development of Newbury's IATC claim and denied relief on the merits of both the exhausted and unexhausted portions of the claim.  Therefore, according to the State, Newbury has already received all of the relief mandated by *Martinez* – federal review of his claim.

The State argues that a remand to the district court for a second merits review would be a waste of the district court's time and would unnecessarily delay resolution of the case.  The State points out that in *Trevino*, the Supreme Court left for this court's determination which court – state or federal – should be permitted to decide, in the first instance, the merits of the IATC claim.  The State argues that where a full and thorough merits determination has already

been done by the district court and the claim has been found wanting, there is nothing in *Martinez* or *Trevino* that requires the district court to give Newbury a second chance to demonstrate that state habeas counsel was ineffective and that his claim has "some merit." According to the State, it is irrelevant whether Newbury could prove that he might surmount some initial-review test to avoid a procedural bar of his claim, because the district court has already allowed factual development of the claim (granting $7,500 to hire a mitigation specialist to investigate the IATC claim) and concluded that the claim fails under *Strickland*. The State contends that it defies logic to suggest that *Martinez* intended that a petitioner be allowed to return to the district court to disprove a procedural ruling when a federal merits review – the only relief offered by *Martinez* – has already been decided against him.

In his reply brief, Newbury argues that because the state court did not have all of the evidence before it when it ruled on his IATC claim, due to ineffective state habeas counsel, he has not had a full and fair determination of the merits of his claim in state court, and that is why *Martinez* applies. He contends that the equitable rule created by *Martinez* and *Trevino* affords relief from the legal ruling in *Pinholster*. According to Newbury, the State's argument that further development of the record is unnecessary and not required by *Martinez* and *Trevino* would render those opinions meaningless: if a claim is defaulted by ineffective assistance of state habeas counsel there is, by definition, a need for evidentiary development of the claim.

Newbury argues that the district court abused its discretion by denying funding for an expert, because the expertise of a psychologist is necessary to explain to the court the mitigating significance of the psychological conditions identified in the mitigation specialist's affidavit. He asserts that when the district court concluded that the omitted mitigating evidence could not have overcome the evidence of Newbury's future dangerousness, it substituted its

34

No. 10-70028

lay judgment for a psychologist's expert explanation of how those factors affected Newbury. He maintains that an expert might well have demonstrated how some of the very facts that suggested Newbury presented a future danger were nonetheless facts born of events beyond his control that reduced his moral culpability for his actions.

Having thoroughly re-examined the record, and having reconsidered our decision in the light of *Trevino* and the arguments of the parties, we now turn to explain why we once again deny Newbury's request for a COA. Before doing so, however, we first address Newbury's argument about funding.

### III.

The district court granted Newbury the maximum amount allowed by the statute, $7,500, for a mitigation specialist. *See* 18 U.S.C. § 3599(f), (g)(2).[5] The district court denied Newbury's request for additional funding for an expert to issue an opinion about the evidence uncovered by the mitigation specialist, holding that Newbury had not shown that such payment was "necessary to provide fair compensation for services of an unusual character or duration." *Id*. We hold that the district court did not abuse its discretion by denying additional funding. *See Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2004) (stating that a COA is not needed to appeal the denial of funds for expert assistance and that such orders are reviewed for abuse of discretion). We now turn our attention to Newbury's COA request.

---

[5] In an unpublished opinion, this court stated that *Martinez* does not mandate pre-petition funding. *Crutsinger v. Stephens*, 540 F. App'x 310, 317 (5th Cir. 2013). In *Crutsinger*, the district court denied prepetition funding on the ground that the petitioner's IATC claim was procedurally barred. Although the district court in this case held that Newbury's IATC claim was procedurally barred, it nonetheless granted his prepetition request for funds with which to hire a mitigation specialist.

IV.

When a district court denies habeas relief on a procedural ground

> without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When the district court denies relief on the petitioner's constitutional claim on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id*.; *see also Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003) (stating that a prisoner seeking a COA makes "a substantial showing of the denial of a constitutional right . . . by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further" (citations and internal quotation marks omitted)).

We agree with Newbury that the district court's procedural ruling that ineffective assistance of state habeas counsel cannot constitute cause to excuse a procedural default is incorrect in the light of *Martinez* and *Trevino*.  That procedural error, however, will not, standing alone, support Newbury's claim for a COA to allow the remand he seeks for further development of his claims.  Because the district court, in its alternative holding, rejected his constitutional claims on the merits, Newbury cannot obtain a COA unless he also demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack,* 529 U.S. at 484.

Under *Martinez*, in order for the federal court to consider the evidence Newbury presented for the first time in federal court, Newbury must show that (1) his state habeas counsel was ineffective in failing to present that evidence to the state habeas court, and (2) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit." *Martinez*, 132 S. Ct. at 1318. To establish ineffective assistance of state habeas counsel, Newbury must show both that habeas counsel's performance – in failing to present to the state habeas court the evidence that he presented for the first time in federal court – was deficient and that he was prejudiced by the deficient performance – that is, that there is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Martinez*, 132 S. Ct. at 1318 (suggesting that the *Strickland* standard applies in assessing whether habeas counsel was ineffective).

Even if a petitioner makes both of the showings required under *Martinez*, that "does not entitle [him] to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320. As we have set out in detail in this opinion, the district court thoroughly and carefully considered all of the evidence that Newbury presented, including the evidence presented for the first time in federal court, and held that Newbury's IATC claim lacks merit because he can demonstrate neither deficient performance nor prejudice under *Strickland*. Because Newbury has already received all of the relief available to him under the authority of *Martinez* and *Trevino*, that is, review of the merits by the federal court, it is not necessary for us to remand the case for the district court to determine whether Newbury's state habeas counsel was ineffective or whether his IATC claim has "some merit" under *Martinez*. All

that we need to determine is whether reasonable jurists would find debatable the district court's decision that Newbury's IATC claim lacks merit under *Strickland*, the clearly established federal law governing IATC claims.

To succeed on an IATC claim, "[f]irst, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* To show deficient performance, "[t]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

"[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.*

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given

case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (citations and internal quotation marks omitted).

With respect to the duty to investigate,

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91.

To demonstrate prejudice, Newbury

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011) (citation omitted). "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome. . . . Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* at 791–92 (citations omitted).

First, with respect to the deficient performance prong of *Strickland*, we hold that reasonable jurists would not debate the district court's decision that Newbury's trial counsel's performance was constitutionally adequate. In conducting their investigation, they did not fail to pursue obvious leads, and they presented a thorough case for mitigation. Trial counsel presented six witnesses to testify about Newbury's family, medical, and educational history.

The jury heard about Newbury's traumatic childhood, including his grandmother's physical and emotional abuse of him and his father's neglect and abuse. Trial counsel emphasized the positive influence Newbury had on his wife and stepchildren, and presented evidence of the heightened security to which he would be subjected if sentenced to life in prison. The new evidence Newbury presented for the first time in the state habeas proceedings, as well as the new evidence he presented for the first time in federal court, undoubtedly provides more details. However, with the exception of his sister's description of Newbury attempting to hang himself when he was eight years old, the new evidence is of the same genre as that presented to the jury at trial. As the district court pointed out, trial counsel's open-ended questions gave Newbury's sister ample opportunities to tell the jury about his suicide attempt. Moreover, the evidence presented for the first time in federal court also contains information that would have been damaging to Newbury, including evidence that Newbury had a history of rage, violent fighting, shoplifting, and robbery, beginning when he was very young.

We also hold that reasonable jurists would not debate the district court's decision that Newbury was not prejudiced, because there is not a reasonable probability that the jury would have answered the special issues in a different manner had trial counsel presented the evidence that Newbury claims they should have presented. The State's evidence of Newbury's future dangerousness and moral culpability was overwhelming. He had three armed robbery convictions, the last of which resulted in the 99-year sentence he was serving when he escaped from prison. In an attempt to escape from prison in 1981, he attacked a guard with a broken light bulb. While in prison, he received 15 disciplinary charges, most of which were for violent conduct. After his last escape, he actively participated in several armed robberies, including the one in which he, along with other escapees, killed Officer Hawkins. He led

law enforcement authorities on a cross-country manhunt for nearly a month before his capture, jeopardizing the lives and safety of the public as well as law enforcement officers.  When he was captured, 12 loaded firearms were found in his hotel room.  He had no remorse for Officer Hawkins's death.  He bragged that he was on America's Most Wanted television show for four weeks.  He blamed the killing of Officer Hawkins on poor police training.  It is plain that in the light of his life of unrelenting violence, the defaulted evidence that Newbury argues that his trial and state habeas counsel should have presented would not have added significantly to the body of mitigating evidence that the jury heard, and it contained damaging information that could have adversely affected trial counsel's attempts to portray Newbury to the jury in any sort of a positive way.  In sum, reasonable jurists would not debate the district court's conclusion that, weighing the State's powerful evidence of future dangerousness and moral culpability against Newbury's far weaker mitigation evidence, a juror would not have been persuaded to answer the special issues in a manner that would have resulted in a life sentence.

To sum up:  Because the district court addressed the merits of Newbury's IATC claim, including the evidence presented for the first time in federal court, it is not arguable but that Newbury has already received all of the relief available to him under the authority of *Martinez* and *Trevino*.  Considering all of Newbury's evidence, including that presented for the first time in federal court, reasonable jurists would not debate the district court's decision that Newbury's IATC claim lacks merit.  Because Newbury has not presented a debatable IATC claim, he is not entitled to a COA, notwithstanding the district court's procedural error in concluding that ineffective habeas counsel cannot constitute cause for a procedural default.  *See Slack*, 529 U.S. at 478, 484.

No. 10-70028

V.

Because Newbury has not made a substantial showing of the denial of a constitutional right, his application for a COA is

DENIED.