# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70026

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2014

Lyle W. Cayce
Clerk

TRACY LANE BEATTY,

Petitioner–Appellant,

v.

WILLIAM STEPHENS, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent–Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before OWEN, ELROD, and HAYNES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Petitioner Tracy Lane Beatty was convicted of the capital murder of his mother and sentenced to death. The Texas Court of Criminal Appeals affirmed on direct appeal and denied habeas relief. The district court denied Beatty's federal habeas petition and denied a certificate of appealability ("COA"). Beatty argues on appeal that he is entitled to a COA on two ineffective-assistance-of-counsel claims. Because the district court's decision is not debatable, we DENY Beatty's application for a COA.

I.

As explained in detail by the Texas Court of Criminal Appeals, Beatty murdered his mother, Carolyn Click, on November 25, 2003. *See Beatty v. State*, No. AP-75010, 2009 WL 619191, at *1 (Tex. Crim. App. Mar. 11, 2009)

No. 13-70026

(direct appeal).  Beatty and Click had a "volatile and combative relationship." *Id.* at \*1.  According to witnesses Betty McCarty and Lieanna Wilkerson, each a neighbor and friend to Click, Beatty had assaulted Click several times in the past.  *Id.*  Indeed, Wilkerson testified that once Beatty "had beaten [Click] so severely that he had left her for dead."  *Id.* at \*2 (internal quotation marks omitted).

Nevertheless, Beatty, an adult who had been out on his own, moved back in with his mother in October 2003.  *Id.* at \*1.  The relationship never improved.  McCarty testified that Click told Beatty to leave in October 2003.  *Id.*  The separation was short, however; Beatty soon returned to his mother's home.  *Id.*  McCarty testified that Click again told Beatty to leave on November 25, 2003, the day of Click's murder.  *Id.*  At approximately 4:00 p.m. that day, Click said to McCarty:  "I told [Beatty] to leave today."  *Id.* (internal quotation marks omitted).  According to McCarty, Click said about Beatty:  "I put up with all I'm going to put up with."  *Id.* (internal quotation marks omitted).

Wilkerson testified that Beatty and Click fought daily when they lived together and that "[s]everal times [Beatty] had said he just wanted to shut [Click] up, that he just wanted to choke her and shut her up."  *Id.* at \*2 (internal quotation marks omitted).  Wilkerson described a conversation she had with Beatty in which he expressed his anger about Click refusing to drive him to a job interview because "she just didn't feel like it."  *Id.* (internal quotation marks omitted).  Beatty told Wilkerson that he had thought about killing Click with a hammer and shoving her under the house but that he "couldn't do it" because she would have "started stinking."  *Id.* (internal quotation marks omitted).  Despite Beatty's obvious troubles, Wilkerson befriended Beatty, sometimes allowing him to stay at her house to give Beatty and Click an opportunity for some time apart.  *Id.*  The night of November 25, 2003, Beatty ate dinner at

2

No. 13-70026

Wilkerson's house, arriving at approximately 6:00 p.m. and leaving at approximately 10:00 p.m. *Id.* at *3.

In the days that followed, Beatty told differing stories about Click's murder. *Id.* The most succinct version—and the final version put forth in the Texas Court of Criminal Appeals' narrative—came from Wilkerson. Wilkerson testified that the "last thing" that Beatty told her about the night of Click's murder was that "when he left [Wilkerson's] house, he went directly across the street to [Click's] house and that [Click] was waiting for him, and that when he came through the door, they had a horrible fight." *Id.* (internal quotation marks omitted). Beatty told Wilkerson that he "chok[ed] Click until she fell to the floor" and that he did not realize that she was dead "until he woke up the next morning." *Id.* at *4. Beatty then crudely buried his mother behind the home. *Id.* at *3.

The day after Click's murder, Beatty took a turkey to Wilkerson's house. *Id.* Beatty told Wilkerson that he had picked up the turkey for Thanksgiving but that he no longer needed it because Click had gone out of town. *Id.* In the weeks after Click's death, Beatty used Click's credit and debit cards to make purchases and disposed of her belongings. *Id.*

Beatty was indicted for capital murder. The state alleged that Beatty had murdered Click in the course of committing either robbery or burglary. At trial, where Beatty was represented by Robert Perkins (lead counsel) and Ken Hawk (co-counsel), the state presented evidence of the above-described facts. The defense team did not put on any evidence after the state rested its case-in-chief.

The trial court instructed the jury that a person commits capital murder if the person commits murder "in the course of committing or attempting to commit the offense of robbery or burglary." *See* Tex. Penal Code § 19.03(a)(2). The trial court further instructed the jury that a person commits "burglary" "if,

without the effective consent of the owner [of a habitation], he enters [the] habitation with intent to commit a felony, theft, or an assault." *See* Tex. Penal Code § 30.02(a)(1).

In closing argument, lead counsel Perkins did not argue that Beatty had not committed murder. Instead, Perkins argued that the state had not satisfied its burden to prove capital murder:

> When they get through arguing, ask yourself, am I convinced beyond a reasonable doubt of this, for the commission of intentional murder, along with the commission of burglary or robbery to be capital murder? The intent to commit the offense of robbery or burglary must be formed prior to or concurrently with the murder. . . . Where is the proof of that?

More specifically, Perkins focused on the relationship between Beatty and his mother to show that there was no burglary:

> Let's talk about why Tracy Beatty killed his mother . . . . They've had a stormy relationship. I mean, I don't need to dig all those letters out. He had written letters for years that the State put into evidence about trouble and "didn't like her" and "don't ever put me in a room with her; I'll walk out, and I'll be mad at anybody"— whoever tried to get him and her together again. Y'all remember those. I don't need to go through all of those again.
>
> It's showing his threats. You know, remember the hammer thing. "I was helping her put the underpinning on the house, and she handed me a hammer, and all I could think about was hitting her in the head with it."
>
> Now, I could see why that might be important to the State if he said, "All I could think about was how bad I wanted that car, and I thought about hitting her in the head and killing her," or "I sure wish that I had money," or "I wish that she would give me some money." There's not any evidence that he was—I mean, he didn't have any money, but how much money did she have?
>
> There's not any evidence that there had ever been any kind of theft or robbery or that she had thrown him out for stealing from her. There is nothing like that. What it is, is his sorry attitude. That's the only evidence.

No. 13-70026

To emphasize that the murder occurred as the result of a fight and not in pursuit of stealing Click's possessions, Perkins argued: "He killed her but not in the course of . . . committing burglary . . . . [F]urther indication that there was a verbal confrontation between the two of them [is] [t]he fact that the attack was at her throat to shut her, shut up, shut up, shut up, beat her up, shut her up, killed her." Perkins invoked the testimony of both McCarty and Wilkerson: "Betty McCarty and Lieanna Wilkerson, they came in as . . . witnesses to these arguments, the fact that they couldn't get along." Perkins even gave the jury a reason for the murder:

> [L]et's talk about a reason that makes more sense. He was frustrated with her. He was tired of her. He had indicated in those letters, year after year after year, she's controlling him. . . . The most sound theory, if you will, what the evidence supports the most is, is that he killed her because they had a longstanding, stormy relationship.

Perkins also touched on intent-to-commit-assault burglary. Perkins addressed the intent issue by arguing that, if Beatty had the intent to commit an assault, then he did not have the requisite intent to commit murder:

> [I]f Tracy Beatty entered that house with the intent to commit assault, he's committing burglary of a habitation. That's true. . . . [But] if his intent is to commit a bodily injury or serious bodily injury and he enters a habitation with the intent to do that and he goes in there with the intent to cause bodily injury or serious bodily injury and he commits an act clearly dangerous to human life, that ain't capital murder.

As for the unlawful entry element of burglary, Perkins discussed the lack of evidence to show that Beatty that did not have consent to enter:

> But this "kicked out," "told to leave," "asked to leave" business, let me make sure that y'all all understand one thing. There is no evidence that Carolyn Click ever told Tracy Beatty that. There is no evidence of that. You know what the evidence is? The evidence is that Carolyn Click told Betty McCarty that she said that. You see the difference?

5

No. 13-70026

. . . .

Carolyn Click told Betty McCarty that she had asked him to leave before. . . . So what kind of kicking out is that?

The jury returned a verdict of guilty, indicating on the special verdict form that the state had proved beyond a reasonable doubt that Beatty had committed murder in the course of committing a burglary.

During the punishment phase, the state presented evidence in support of the death penalty. The defense team did not present any evidence. Prior to resting, the defense team explained in a hearing that it had obtained the assistance of a psychiatrist and a psychologist but that neither would testify because each believed Beatty to be a future danger to society. The defense team also explained that it had considered calling two witnesses and putting Beatty himself on the stand but that, on balance, it had decided that those witnesses would be more harmful than beneficial. Beatty orally confirmed to the trial court that he agreed with that explanation.

The trial court instructed the jury regarding the "special issues" provided in Article 37.071 of the Texas Code of Criminal Procedure. Answering the special issues, the jury found that Beatty would commit criminal acts of violence constituting a continuing threat to society and that the mitigating circumstances were not sufficient to warrant a sentence of life instead of death. Accordingly, the trial court imposed a sentence of death.

The Texas Court of Criminal Appeals affirmed Beatty's conviction and sentence on direct appeal. *Beatty*, No. AP-75010, 2009 WL 619191. The court concluded that the evidence was sufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979): "A rational jury could infer that [Beatty] was angry after Click told him to get out and that he entered Click's house [without consent and] *with intent to assault* her again or kill her, or at least take some of her money or her possessions." *Beatty*, 2009 WL 619191, at *5 (emphasis added). Judge

6

Johnson, joined by Judges Price and Holcomb, dissented, reasoning that while the state "amply proved murder" it did not prove the underlying burglary felony because it did not prove a "lack of consent to enter [the habitation] or entry with the intent to commit a felony, theft, or assault." *Beatty v. State*, No. AP-75010, dissenting slip op. at 5 (Mar. 11, 2009) (Johnson, J., dissenting). The dissent reasoned that the evidence reflected an ambiguity regarding whether Beatty's entry was "without consent of the owner." *Id.* at 3 (internal quotation marks omitted). The dissent further reasoned that the evidence at trial demonstrated only speculation about Beatty's intent as he entered the home. *Id.* at 4.

Beatty filed his first and only state habeas application in 2007, asserting ten grounds for relief. After a hearing, the habeas court issued findings of fact and conclusions of law, recommending that the application be denied. The Texas Court of Criminal Appeals adopted the habeas court's findings and conclusions (except for "Findings of Fact, paragraphs 29, 60, 61, 65, 81, 100, 131, 132, 143, 154, and 160" and "Conclusions of Law, last sentence of paragraph 170") and denied habeas relief. *Ex Parte Beatty*, No. WR-59939-02, 2009 WL 1272550 (Tex. Crim. App. May 6, 2009). Beatty filed his federal habeas petition in the district court soon thereafter, asserting ineffective-assistance-of-counsel claims. The district court denied the petition and denied a COA. *Beatty v. Dir., TDCJ-CID*, No. 4:09-cv-225, 2013 WL 3763104 (E.D. Tex. July 16, 2013). Beatty now requests a COA from this court. Beatty has narrowed the litigation to two issues: (1) whether his trial counsel was ineffective for failing to investigate and present mitigating evidence at the punishment phase of his trial; and (2) whether his trial counsel was ineffective for failing to investigate and present evidence to show that the crime was murder, not capital murder.

No. 13-70026

II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs our consideration of Beatty's request for a COA. Under AEDPA, a petitioner must obtain a COA before he can appeal a district court's denial of habeas relief. 28 U.S.C. § 2253(c)(1); *see Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (describing a COA as a "jurisdictional prerequisite" without which "federal courts of appeals lack jurisdiction to rule on the merits of the appeals from habeas petitioners"). A COA is warranted upon a "substantial showing of the denial of a constitutional right." § 2253(c)(2). A petitioner satisfies this standard if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The issue is "the debatability of the underlying constitutional claim, not the resolution of the debate." *Miller-El*, 537 U.S. at 342; *see also Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) ("[A]ny doubts as to whether a COA should issue must be resolved in [the petitioner's] favor."). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *See Miller-El*, 537 U.S. at 336. To obtain a COA when the district court has denied relief on procedural grounds, such as procedural default, a petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

We evaluate the debatability of Beatty's constitutional claims through the lens of AEDPA's highly deferential standard. *See Renico v. Lett*, 559 U.S. 766, 773 (2010). We may not grant habeas relief unless the petitioner first has exhausted state remedies with respect to the claim at issue. 28 U.S.C. § 2254(b)(1)(A). If the petitioner has met the exhaustion requirement, he must

No. 13-70026

prove that the state court's constitutional adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)–(2).

Clearly established federal law is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state-court decision is contrary to clearly established federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413. A state-court decision fails the "unreasonable application" prong if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.*; *see White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error."). We accept a state court's factual findings as correct "unless contravened by clear and convincing evidence." *Moody v. Quarterman*, 476 F.3d 260, 267–68 (5th Cir. 2007).

### III.

### A.

Beatty contends that he is entitled to a COA and, ultimately, to habeas relief because he received ineffective assistance of counsel at trial. An ineffective-assistance-of-counsel claim derives from the Sixth Amendment's enshrinement of the right of every defendant to the "assistance of counsel for

his defence." To prevail on such a claim, a defendant must show: (1) that counsel's performance was deficient; and (2) that such deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (denying relief to habeas petitioner challenging death sentence). This two-pronged approach requires the defendant to demonstrate that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The defendant must meet both prongs; otherwise, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* Thus, at the COA stage, we must examine whether jurists of reason would debate whether the defendant established both prongs. *See Slack*, 529 U.S. at 484.

The first *Strickland* prong requires the defendant to show that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. Any such showing must overcome a "strong presumption" that the representation did fall "within the wide range of reasonable professional assistance." *Id.* at 689. In an ineffectiveness claim that relies on a failure to develop evidence, the deficient performance question depends on whether "the investigation supporting counsel's decision . . . was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Counsel is not required to "pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 131 S. Ct. at 789–90. Moreover, counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.

Under the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

No. 13-70026

Because this case arises under AEDPA, *Strickland* is not the only standard we must keep in mind. When a petitioner brings a *Strickland* claim under AEDPA, the "pivotal question" is not whether the petitioner was deprived of his right to counsel under the Sixth Amendment. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Instead, "the question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* Both the *Strickland* standard and AEDPA standard are "highly deferential," and "when the two apply in tandem, review is doubly so." *Id.* at 788 (internal quotation marks omitted).

B.

Beatty asserts two claims: (1) a claim based on the defense team's alleged failure to investigate and present mitigating evidence at the punishment phase ("punishment-phase claim"); and (2) a claim based on the defense team's alleged failure to investigate and present evidence to show that Beatty did not commit a burglary ("guilt-phase claim"). In Part III.B.1 below, we discuss the habeas evidence on which Beatty relies to support these claims. Next, in Part III.B.2, we address whether Beatty has procedurally defaulted on his guilt-phase claim. Last, in Part III.B.3, we consider Beatty's entitlement to a COA on each of his ineffective-assistance-of-counsel claims, assuming *arguendo* that he could survive the procedural hurdle for the guilt-phase claim.

1. Habeas Evidence

Fifteen people testified at the hearing regarding Beatty's state habeas application. The district court's opinion thoroughly describes the witnesses' testimony and the habeas court's findings regarding their testimony. *See Beatty*, 2013 WL 3763104, at \*6–\*9. Beatty focuses in his brief on the testimony of selected individuals.

Beatty relies on the habeas testimony from Tim Day, who was married to Click from 1978 to 1984. Tim Day testified at the habeas hearing that Click

had mental problems and that he once observed Click and Beatty in a physical altercation. Tim Day was not contacted by defense counsel. Beatty also points to the testimony of Chad Day and Kamie Bently, Tim Day's son and daughter, both of whom lived with Click for a period of time. Chad Day and Bently testified that Click physically and emotionally abused them but not Beatty. For example, according to Chad Day and Bently, Click would require them to walk around in circles outside in the heat all day. Furthermore, Chad Day and Bently testified that, when beating them, Click would force them to take their clothes off and that Click herself would be in the nude during the beatings. Bently also testified that one time, when Click was beating her, Beatty said to Click: "That's enough." Bently admitted that this incident demonstrated that Beatty was aware of the abuse and yet let it go on for a certain period of time. Neither Chad Day nor Bently was contacted by defense counsel. Dr. Edward Gripon, a forensic psychiatrist, testified that Click's abusive behavior and mental problems could be considered mitigating evidence.

Beatty relies on the habeas testimony of Lieanna Wilkerson—the same Wilkerson who testified at trial. Wilkerson testified at the habeas hearing that she "didn't feel like [she] was asked very much [at trial] about Ms. Click herself, that the way that they portrayed her was a poor little weak, disabled lady." Wilkerson went on to agree that Click could be a "hateful, vindictive, two-faced old bitch." Beatty also relies on the testimony of Twyla Johnson. Johnson lived across the street from Click and once witnessed an argument between Click and Beatty. Johnson heard Click say to Beatty: "Are you stupid? That's not where I told you I wanted that. Are you just retarded?" Johnson also testified that Beatty and Wilkerson brought a turkey—the same turkey Beatty had taken to Wilkerson—to her house on November 26, 2003, the day after the murder. Johnson was not contacted by defense counsel.

12

Holly Randall, the defense team's mitigation investigator, also testified. Randall testified that she interviewed Beatty prior to trial. Randall was aware of Tim Day, but she testified that Beatty had not provided her with the names of Tim Day's children. In conversation with Randall, Beatty did not refer to his mother as "mother" but instead as the "bitch."

The habeas court found that Tim Day, Chad Day, and Bently would have presented evidence that was significantly more aggravating than potentially mitigating. The habeas court pointed to evidence that Tim Day described Beatty as a "very high strung, hot-headed person" and that he once kicked Beatty out of the house because Beatty had stolen and crashed Click's car; that Chad Day would have told the jury that Beatty "stayed in trouble a lot"; and that Bently would not have had anything good to say about Beatty. The habeas court did not credit Wilkerson's testimony, finding that she was a "biased witness who may let her relationship with [Beatty] taint her testimony to paint him in a better light." The habeas court pointed out that Johnson's testimony about Click yelling at Beatty, if presented at trial, would have been accompanied by Johnson's testimony that Beatty had come to her home with a turkey the day after he murdered and buried his mother.

Beatty does not mention in his brief the habeas testimony of Roy Linn, an investigator appointed to assist in Beatty's defense. The habeas court found that Linn travelled to various locations—Dallas, Cherokee, Van Zandt, Henderson, and Anderson counties—"in search of character witnesses over an eight-week period of time." The habeas court found that Linn met with Wilkerson and contacted several other neighbors and witnesses, none of whom had anything positive to say about Beatty. Relying on Linn's testimony, the habeas court further found that Beatty "was not very helpful and was very hard to communicate with" and that "[o]ther members of the defense team also had a difficult time getting [Beatty] to provide any information." Linn also met

No. 13-70026

with Randall, the mitigation investigator, for over four hours about the case. Beatty does not dispute these findings regarding Linn.

The habeas court further found that lead counsel Perkins followed up on the names of any witnesses provided by Beatty and that none of the information discovered ultimately "panned out" to be, in the defense team's view, "more mitigating than aggravating." Beatty does not dispute these findings. Moreover, co-counsel Hawk explained the problem with putting on evidence to taint the victim:

> Every time we tried to find evidence, especially if anything came up about Ms. Click, the victim in this case, from a strategic standpoint, the danger you have in trying to make the victim of a homicide, who is the mother of a defendant, into the reason for her own death, has got to be clear, nearly to the point of a smoking gun, before you can float that out there, because the potential for an offensive take from a jury . . . .

Hawk also candidly admitted: "[I]n retrospect we'd do almost everything different, because now we know what we tried lost. But at the time, we had to process it through what we knew to make it the best possible position for the best possible result."

## 2. Procedural Bar

The district court's procedural ruling on the guilt-phase claim is a threshold issue. *See Slack*, 529 U.S. at 484–85. In this claim, Beatty alleges that the defense team failed to investigate and present evidence to show that Beatty did not commit a burglary. The district court concluded that Beatty procedurally defaulted by not raising the claim in the Texas habeas court. *Beatty*, 2013 WL 3763104, at *15. We agree. Because Beatty did not raise the claim in the Texas court in his initial state habeas application, the claim would

14

now be procedurally barred in Texas.[1]  Therefore, it also is barred in federal court.  *See* § 2254(b)(1)(A); *see also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) ("If a petitioner fails to exhaust state remedies, but the court to which he would be required to return to meet the exhaustion requirement would now find the claim procedurally barred, then there has been a procedural default for purposes of federal habeas corpus relief.").

Furthermore, Beatty cannot show "cause" for the procedural default under the Supreme Court's decisions in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).  To succeed in establishing cause under *Trevino* and *Martinez*, the petitioner must show: (1) that his claim of ineffective assistance of counsel at trial is "substantial" (i.e., "has some merit"); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application.  *Martinez*, 132 S. Ct. at 1318.

This claim is not substantial for the reasons explained more fully below in Part III.B.3.  *See Wilkins v. Stephens*, __ F. App'x __, 2014 WL 1202524, at *5 (5th Cir. Mar. 25, 2014) ("Concluding that [the petitioner] has failed to state any substantial [ineffective-assistance-of-counsel] claims, we deny a COA." (citing *Trevino*, 133 S. Ct. 1911)); *see also Preyor v. Stephens*, 537 F. App'x 412, 422 (5th Cir. 2013) (concluding that the ineffectiveness of the petitioner's first state habeas counsel "ma[de] no difference to the outcome" because reasonable

---

[1] The abuse-of-the-writ doctrine prohibits defendants in death penalty cases from bringing a subsequent application for a writ of habeas corpus unless the application contains specific facts showing that: (1) the claim could not have been presented in the initial application because the factual or legal basis for the claim was unavailable at the time the initial application was filed; (2) no rational juror could have found the defendant guilty; or (3) no rational juror would have answered the special issues in the affirmative.  Tex. Code Crim. Proc. art. 11.071, § 5.

jurists would not debate the district court's conclusion that the petitioner's claims were "not substantial").

In the alternative, jurists of reason would not debate that Beatty has failed to demonstrate that his state habeas counsel was ineffective for failing to raise this issue. Beatty argues simply that there was "no reason not to argue the ineffectiveness of trial counsel on this issue, particularly in light of the vigorous and substantial dissent." As explained further below in Part III.B.3, the connection between the habeas evidence and the guilt phase of the trial is neither clear nor strong enough to establish that Beatty's habeas counsel was ineffective for failing to raise this issue. *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) (agreeing with the district court that "habeas counsel was not ineffective in failing to raise [a] claim at the first state proceeding" because "there was no merit to [the petitioner's] claim"), *cert. denied*, No. 13-9380, 2014 WL 1254822 (June 30, 2014). Beatty makes no further attempt to explain why his state habeas counsel was ineffective. Accordingly, the district court's procedural decision on the guilt-phase claim is not debatable.[2] Because Beatty procedurally defaulted, he is not entitled to a COA on this claim.

### 3. Ineffective-Assistance-of-Counsel Claims

We now consider whether Beatty has made a "substantial showing of the denial of a constitutional right." *See* § 2253(c)(2). Beatty asserts two claims: (1) the punishment-phase claim (i.e., a claim based on the defense team's alleged failure to investigate and present mitigating evidence at the

---

[2] Because the district court conducted a *Trevino/Martinez* review, *see Beatty*, 2013 WL 3763104, at *16 ("There is nothing else pending before the court that arguably supports relief based on *Trevino*."), this case stands in contrast to those in which this court has remanded for further consideration of a petitioner's right to seek relief pursuant to *Trevino*. *See, e.g.*, *Neathery v. Stephens*, 746 F.3d 227, 229 (5th Cir. 2014) ("[W]e are unable to determine from the record which, if any, of [the petitioner's] ineffective assistance of counsel claims may be preserved for review under *Trevino*.").

punishment phase); and (2) the guilt-phase claim (i.e., a claim based on the defense team's alleged failure to investigate and present evidence to show that Beatty did not commit a burglary). We discuss the claims together because the arguments and evidence supporting each claim are very much intertwined. Beatty complains that the defense team failed to present the circumstances of his relationship with his mother and facts to show "the actual character of Ms. Click as cold, arrogant, demanding." Beatty argues that the state "was allowed to offer un-rebutted evidence as to the loving nature of the decedent" and that "[n]othing was offered by the defense to rebut this damaging testimony." "Consequently," Beatty goes on, "the only belief the jury could have had is that this ex-con killed his mother to obtain her property." Beatty asserts that "[w]itnesses that could describe the tumultuous relationship between [Beatty] and his mother, and witnesses who could describe the eccentricity and bizarreness of Ms. Click's personality were never contacted."

Beginning with *Strickland*'s first prong, we conclude that the district court's decision on the deficiency question is not debatable. The defense team developed a strategy and made a strategic decision not to present evidence that had the potential to be a "two-edged sword." *See Richter*, 131 S. Ct. at 789–90; *Neal v. Puckett*, 286 F.3d 230, at 237 (5th Cir. 2002) (non-exhaustive set of factors used to evaluate reasonableness of defense counsel's investigation: "what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results might he reasonably have expected from these leads").

As to the punishment-phase claim, the habeas court found that the investigations carried out by investigator Linn and lead counsel Perkins did not turn up any witnesses who would have had anything good to say about Beatty or any evidence that was more mitigating than aggravating. *See Richter*, 131 S. Ct. at 789–90. Dr. Gripon's testimony that evidence of Click's

abusive behavior *could* have been mitigating does not reflect significantly on the defense team's investigation and decision-making with respect to the punishment phase of the trial. Thus, under the circumstances and applicable law here, the failure to pursue further evidence of Click's personality did not fall below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.[3]

Our analysis of the guilt-phase claim leads to a similar result. Perhaps, in hindsight, the defense team would have conducted the guilt phase differently, as co-counsel Hawk explained. At the time of the trial, however, the defense team made the decision to attack the evidence supporting the burglary element of the capital murder charge. Lead counsel Perkins's closing argument makes that decision readily apparent. The failure to investigate even more evidence regarding the dysfunctional relationship between Beatty and Click was not deficient for purposes of AEDPA review. Thus, Beatty cannot make the requisite showing with respect to deficiency for his guilt-phase claim. Put simply, we agree with the district court that the defense team's representation "cannot be characterized as deficient for failing to present to the jury minimal additional statements that his mother was a mean cold-hearted bitch." *Beatty*, 2013 WL 3763104, at *16.

Turning to the second prong, even if the defense team was deficient, Beatty has not given us any reason to doubt the district court's disposition with respect to prejudice for either claim. Beatty makes no discrete argument as to why the defense team's alleged failure to investigate mitigating evidence prejudiced Beatty at the punishment phase. *See Strickland*, 466 U.S. at 695 ("[T]he question is whether there is a reasonable probability that, absent the

---

[3] We also refer back to the defense team's concern, as far as evidence about Click's behavior goes, about the "potential for an offensive take from a jury."

errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). We see no reason to conclude that more evidence highlighting Click's personality problems would have swayed the outcome. Given the "two-edged" nature of the evidence on which Beatty focuses here, there is no debate over the district court's conclusion that the evidence was not enough to satisfy the prejudice prong for the punishment-phase claim.

As to the guilt-phase claim, Beatty argues that the "omitted evidence"—i.e., the habeas evidence summarized above—would have been "strong additional support" for the jury to conclude that the murder "was committed not in pursuit of financial gain, but rather in a moment of anger. At worst, in light of the otherwise absence of evidence of intent to commit the burglary, it is sufficient to raise a reasonable doubt." It is unclear how the failure to investigate and present evidence of Click's personality, behavioral problems, or past abuse of other children prejudiced Beatty at the guilt stage. Indeed, within the confines of AEDPA, we cannot conclude that such evidence likely would have affected the jury's decision that Beatty entered the house with the requisite intent. As explained by the Texas Court of Criminal Appeals, it was rational for a jury to conclude that Beatty had the intent to commit assault.[4] Whether Beatty was "in pursuit of financial gain" is irrelevant to whether Beatty intended to commit assault. Furthermore, apparently neither the jury nor the Texas Court of Criminal Appeals was swayed by the defense team's argument that Beatty had only the intent to commit assault the entire time he was inside the house and never formed the intent to commit murder. On the unlawful entry element of burglary, the jury heard the testimony from

---

[4] This evidence actually might have made a guilty verdict an even easier choice for the jury. In any case, that is not the point. Beatty has failed to demonstrate the debatability of the district court's decision on the prejudice prong.

No. 13-70026

McCarty and apparently decided that it was enough, in spite of Perkins's closing argument. None of the habeas evidence on which Beatty relies creates any doubt about the district court's decision on the prejudice prong for the guilt-phase claim.

## IV.

Beatty's first claim, which involved allegations of ineffective assistance at the punishment phase of the trial, does not warrant full consideration on the merits. Moreover, Beatty procedurally defaulted on his second claim, which involved allegations of ineffective assistance at the guilt phase of the trial. Even assuming *arguendo* that Beatty has not procedurally defaulted on that claim, we conclude that the claim does not warrant a COA. The application for a COA is DENIED.