# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 15-70017

————

RAYMOND DELEON MARTINEZ,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

————

Appeal from the United States District Court
for the Southern District of Texas
USDC No.  4:13-CV-1994

————

United States Court of Appeals
Fifth Circuit

**FILED**

June 24, 2016

Lyle W. Cayce
Clerk

Before JONES, DENNIS, and CLEMENT, Circuit Judges.

EDITH H. JONES, Circuit Judge:*

Raymond Deleon Martinez stands before us twice convicted of the 1983 capital murder of Herman Chavis and three times sentenced to death for that crime.  His case has seen three rounds of review on direct appeal, three rounds of state habeas review, and is now on its second round of federal habeas review. The district court in this round of federal habeas litigation denied his petition and did not issue a Certificate of Appealability ("COA").  He seeks a COA from

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-70017

this court. We grant a COA on ineffectiveness claims concerning autopsy reports and medical examiner testimony, deny a COA on Martinez's other claims, deny habeas relief, and affirm the district court's denial of funds to develop one of his claims.

## I

The facts of Martinez's crime have been well documented in numerous state and federal courts. This court earlier summarized them as follows:

> On July 13, 1983, Martinez, accompanied by two other men, entered the Long Branch Saloon owned and operated by Herman Chavis, the victim, and his wife, Pauline Chavis Smith. Smith recognized the three men from the previous Monday and Tuesday nights, when they came in, purchased beer, took only one sip, and left. On this date, the men ordered three Miller Lite beers and stood at the bar. Soon thereafter, one of the men locked the front door, produced a revolver, and told everyone to "hit the floor." Martinez also brandished a revolver and threatened a patron. He then grabbed the barmaid, shoved the revolver into her ribs, and demanded the money from the cash drawer. Martinez was seen reaching into the drawer, although it was later determined that he took no money. A verbal exchange between Chavis and the men ensued, after which Martinez pointed his gun at Chavis. Several shots were fired. Chavis later died of a gunshot wound to the back of the head and a gunshot wound through the back that lodged in his right arm.

*Martinez v. Dretke*, 404 F.3d 878, 880-81 (5th Cir. 2005), *cert. denied* 546 U.S. 980, 126 S. Ct. 550 (2005) (footnotes and citations omitted).

Martinez was initially convicted on March 15, 1984 and sentenced to death. *See id.* at 880 n.1. This conviction and sentence were subsequently reversed and remanded on direct appeal due to jury-selection errors. *Martinez v. State*, 763 S.W.2d 413 (Tex. Crim. App. 1988). A second trial resulted in another guilty conviction and death sentence, which were affirmed on direct appeal. *Martinez v. State*, 867 S.W.2d 30 (Tex. Crim. App. 1993) (en banc),

2

No. 15-70017

*reh'g denied*, (October 20, 1993), *cert. denied*, 512 U.S. 1246, 114 S. Ct. 2765 (1994). Martinez's state application for a writ of habeas corpus based on ineffective assistance of counsel was rejected. *See Martinez v. Dretke*, 404 F.3d at 882-83; *Ex parte Martinez,* No. 42,342–01 (Tex. Crim. App. 1999).

He then filed a § 2254 petition for a writ of habeas corpus in federal district court in 2001.

> On February 6, 2003, the district court held an evidentiary hearing on the following issues: (1) whether Martinez was mentally ill at the time of his offense; (2) whether his trial counsel was ineffective for failing to present an insanity defense; and (3) whether there was cause for any procedural default of these claims. At the hearing, Martinez submitted evidence that he has a family history of mental illness, was exposed to neurotoxins in utero and through adolescence when he picked cotton as a migrant farm worker, was physically abused by an older brother, was physically abused by prison guards while in care of the Texas Youth Commission, suffered untreated epileptic seizures, and was previously adjudged not guilty by reason of insanity for an unrelated crime in 1967.

*Martinez v. Dretke*, 404 F.3d at 883 (footnote omitted). The district court denied his petition and denied a COA.

On December 19, 2003, he asked this court for a COA, claiming ineffective assistance of counsel by his counsel's failure to:

> (1) conduct an adequate investigation into his mental health background; (2) introduce evidence of neurological impairment and a prior adjudication of not guilty by reason of insanity as a mitigating factor and assert an insanity defense during the guilt/innocence phase of his trial; and (3) introduce evidence of his neurological impairment as a mitigating factor during the punishment phase of his trial.

*Id.* We denied a COA on the first issue and held that his counsel had conducted an adequate investigation of his background, including his alleged exposure to neurotoxins in utero and his use of anti-psychotic medications. *Id.* at 885-87.

No. 15-70017

We invited additional briefing on the latter two issues and granted a COA. *Id.* at 887. Nonetheless, we ultimately denied habeas as to all of his claims. We held that his trial counsel's failure to advance an insanity defense would constitute a fraud on the court given psychological evaluations that concluded Martinez did not suffer from any psychological disorders; testimony from his own expert witness that his in utero and adolescent exposure to pesticides would support only a post-hoc conjecture of a brain disorder; the lack of any of his counsels' personal experiences that would suggest their awareness of potential disorders; and the availability of a viable alternative defense supported by the record. *Id.* at 888-89. Further, we held that "counsel's decision not to introduce evidence of neurological impairment (i.e. organic brain damage) as mitigating evidence at the punishment phase constituted reasonable and protected professional judgment" because evidence of organic brain injury is a "double-edged sword." *Id.* at 889; *see also Kitchens v. Johnson*, 190 F.3d 698, 702-03 (5th Cir. 1999).

After we denied habeas relief, Martinez filed a subsequent state habeas application, raising a claim he had argued at his second trial and 1993 direct appeal, but not in his first state habeas application in 1997. *Ex parte Martinez*, 233 S.W.3d 319 (Tex. Crim. App. 2007). The state court held that because of intervening case law, this was not an abuse of the writ, and granted habeas relief. *Id.* at 322-23. Martinez received a new trial as to punishment only.

The third punishment trial was held in 2009, and Martinez was sentenced to death a third time. At this trial, the jury heard the facts of the Chavis murder as well as testimony regarding Martinez's criminal history, violence and dangerousness in prison, and gang affiliation. *See Martinez v. State*, 327 S.W.3d 727, 731-35 (Tex. Crim. App. 2010), *cert. denied* 563 U.S. 1037, 131 S. Ct. 2966 (2011) (more completely summarizing the facts before the 2009 jury).

4

No. 15-70017

The 2009 sentencing jury heard about Martinez's long and violent criminal history. That history began when he was fifteen and was sent to juvenile prison for statutory rape of a twelve-year-old girl. Within a few months of his release, he was adjudicated delinquent and sent back to juvenile detention. After his release at age eighteen, he was sentenced to a two-year prison term for burglary in 1964. He attempted to escape in 1965. He committed burglary in 1967, but was found not guilty by reason of insanity. His sanity restored, he was released in 1969, but he went on to commit four robberies (two armed), one theft of an automobile, and an escape from jail while in custody. He received a total sentence of 20 years for these crimes. He lived with his family after his parole in 1982. He terrorized them, bragged to them about crimes he committed while in prison, and recounted robberies and assaults he committed in the Fort Worth area.

The jury heard testimony about his crime spree that led to the deaths of five people in 1983. In addition to the July 13 robbery of the Long Branch Saloon and the murder of Herman Chavis for which he had been convicted, he committed armed robbery of two other saloons in Houston on July 11 and July 12. The July 11 armed robbery resulted in the death of Moses Mendez, but it was never clearly established who shot Mendez. Martinez then went to Fort Worth to stay with his sister, Julia Gonzales. On July 15, he shot her dead on the side of the road and shot her boyfriend, Guillermo Chavez, seven times in a car, then ransacked their home. Martinez returned to Houston, where he met a prostitute named Traci Pelkey. On July 21, he killed her by hitting her on the head with his gun and then shooting her three times. He was arrested on July 23, 1983 and has been in custody ever since.

The 2009 sentencing jury also heard testimony that Martinez has been a particularly dangerous and violent inmate. During his incarceration beginning in 1969, he was violent toward other inmates, often stabbing them

5

with homemade weapons or attacking them with little provocation. He was paroled in 1982 and rearrested in 1983. Since then, he has 34 documented disciplinary incidents between 1986 and 2005, which likely understates the total number because it does not include incidents that may have occurred while he was in county (as opposed to state) custody. Four of the incidents are classified as minor, and 30 are classified as major. Sixteen are assaults on correctional officers and two are assaults on inmates. In February 2002, he encouraged other inmates to kill a prison guard they had taken hostage and then interfered with the ability of other guards to free the hostage. In June 2002 he made a homemade spear and threw it at a prison guard. There are numerous documented incidences in which Martinez spat upon or threw other bodily fluids at correctional officers and threatened them with physical violence. He managed to unlock his cell door in 2008 and attacked a fellow inmate, then bragged about it. He also bragged to his niece, Laura Escoto, during her visits, about assaults and rapes he committed while in prison and asserted that he had "killed the wrong sister," referring to his killing of Gonzales. He then threatened Escoto when she decided she no longer wanted to continue visiting him in prison. In 2008, he wrote several letters to family members detailing his criminal exploits both in and out of prison. His family members testified at trial that he showed little remorse and referred to himself as a "psychopath."

The sentencing jury heard testimony that Martinez is a known affiliate, and indeed organizer and leader, of the Texas Syndicate prison gang. The jury heard testimony that he killed those who opposed formation of the gang. During his brief period out of prison between 1981 and 1983, Martinez's father attempted to help him find a job. Martinez was more interested in establishing a methamphetamine or marijuana business to generate money for the gang. To do so, he went to California, where he shot and killed the man who provided

No. 15-70017

him with the chemicals needed to start "cooking" the drugs. In early 1983, he checked himself into a mental hospital so he could stall until a friend and fellow gang member was released from prison. He was discharged after assaulting someone at the facility. In May 1983, he met a girlfriend named Mary Salazar who was a teenage runaway. He attempted to recruit her to join the Texas Syndicate and forced her to prostitute herself. She accompanied him on his 1983 crime spree and testified to that at his trial.

After hearing all of this evidence, the jury sentenced Martinez to death for a third time. The sentence was affirmed on direct appeal. *Martinez v. State*, 327 S.W.3d 727 (Tex. Crim. App. 2010), *cert. denied* 131 S. Ct. 2966 (2011). His state habeas application was denied. *Ex parte Martinez*, No. 42,342-03 (Tex. Crim. App. June 26, 2013). He then filed the instant § 2254 petition with the district court in 2013. It denied relief in all respects and denied a COA. *Martinez v. Stephens*, 2015 WL 1282199 (S.D. Tex. 2015). He now seeks a COA from this court.

The district court meticulously considered the following claims of ineffective assistance of his 2009 trial counsel: (1) counsel did not investigate whether Martinez was ineligible for execution under *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242 (2002), because he is intellectually disabled; (2) counsel did not object under *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354 (2004), to a medical examiner's testimony about autopsies he had neither performed nor witnessed, nor (3) to introduction of those autopsy reports;[1] (4) counsel did not present evidence that Martinez suffered from organic brain damage as a result of his exposure to organophosphate

---

[1] The district court considered the two distinct Confrontation Clause claims as one, referring at times in its analysis to the testimony and at times to the reports themselves. These, however, are two distinct claims that we will refer to separately or as "autopsy evidence."

7

No. 15-70017

pesticides; and (5) counsel did not object to allegedly improper questioning and argument by the prosecutor regarding Martinez's sexuality.  Martinez raises an additional claim to this court: (6) that the district court erred in denying Martinez's request for funds to develop his *Atkins* claim.

We will consider the first and sixth issues together; the second and third issues together; and the fourth and fifth issues independently.

## II

Since Martinez's habeas petition complains of detention that "arises out of process issued by a State court," he must obtain a COA before we may hear his appeal.  28 U.S.C. § 2253(c)(1)(a).  A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S. Ct. 3383, 3394 (1983).  A COA is a "jurisdictional prerequisite" such that "until a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." *Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003).  "Under the controlling standard, a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Id.* (internal quotations and alterations omitted) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1603-04 (2000)); *see also Barefoot*, 463 U.S. at 893, 103 S. Ct. at 3394.  "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims," but instead "an overview of the claims in the habeas petition and a general assessment of their merits."  *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039.  To obtain a COA where the district court reached the merits of the constitutional claim, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims

No. 15-70017

debatable or wrong." *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604. Where the district court dismissed a claim on procedural grounds (such as failure to exhaust in state habeas proceedings) without reaching the merits, then "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* In death penalty cases, we resolve any doubts in favor of granting a COA. *See Martinez v. Dretke*, 404 F.3d at 884.

Upon grant of a COA, we apply AEDPA standards to determine whether the petitioner is entitled to habeas relief. Those standards will be discussed as they apply to the various claims Martinez has raised.

## III

We first consider Martinez's *Atkins* claim, the only one he presented to the state habeas court. We also consider the district court's denial of funding to develop that claim.

## A

Martinez asserts that his counsel at his third sentencing hearing were ineffective for failing to conduct a reasonable investigation into, and to present evidence about whether he is intellectually disabled,[2] and therefore ineligible for execution under *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242 (2002). Because this claim was fully adjudicated and ruled on by the state habeas court, § 2254(d) applies. *See Williams v. Stephens*, 761 F.3d 561, 566 (5th Cir. 2014). Under that provision, federal habeas relief may be awarded only if the state court's decision was "contrary to, or involved an unreasonable application

---

[2] The Supreme Court used the term "mental retardation" in *Atkins*, but has since used the term "intellectual disability" to describe the identical phenomenon. *See, e.g., Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014). We follow the same convention.

of, clearly established Federal law, as determined by the Supreme Court," or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2). The federal court's review is limited to the state court record. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011). We presume the state court's factual determinations are correct; Martinez has the burden of rebutting them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Martinez has not met his burden to show that jurists of reason could dispute the district court's rejection of this claim.

Martinez had to establish three elements to prove he is intellectually disabled under Texas law: (1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; and (3) onset prior to the age of 18. *See Lewis v. Quarterman*, 541 F.3d 280, 283 (5th Cir. 2008); *Gallo v. State*, 239 S.W.3d 757, 769 (Tex. Crim. App. 2007). His trial counsel submitted an affidavit to the state habeas court explaining that this was not a viable defense given voluminous evidence that Martinez was not intellectually disabled. The state courts rejected the *Atkins* claim, and the district court upheld their conclusion pursuant to 28 U.S.C. § 2254(d).

A review of the state court record supports the courts' conclusions. On the intellectual functioning prong, the state court found that the results of six psychological examinations over a twenty-two year period from 1966-1988 showed Martinez to be of average intelligence. The court cited various IQ tests administered between 1967 and 2001 indicating that Martinez had scores of 79, 89, 93, and 107—all above the typical cutoff of an intellectual disability under Texas law. *See Blue v. Thaler*, 665 F.3d 647, 658 (5th Cir. 2011) ("[U]nder Texas law, the lack of a full-scale IQ score of 75 or lower is fatal to an *Atkins* claim." (citing *Ex parte Hearn*, 310 S.W.3d 424 (Tex. Crim. App. 2010)); *Ex parte Briseno*, 135 S.W.3d 1, 7 n.24 (Tex. Crim. App. 2004) (a person

with an IQ above 70 is generally presumed to not have an intellectual disability). Martinez's most recent score is worth noting. It was conducted in 2001 and resulted in a Full Scale IQ Score of 107, a Performance IQ of 97, and a Verbal IQ of 114, all of which place Martinez in the average to high-average range. The test was conducted for purposes of an evidentiary hearing during Martinez's first trip through federal habeas review. The state habeas court credited testimony at the 2009 sentencing trial by Martinez's expert, Dr. Lundberg-Love, that these results are accurate.

The state habeas court also found that Martinez had failed to establish limitations in adaptive functioning. It looked to: testimony by Martinez's sister at his 1989 retrial and 2009 punishment trial that Martinez told her he purposefully checked himself into a mental institution in 1983 for access to free food, shelter, and women and to bide time until a friend's release from prison; testimony from Martinez's brother regarding his purposeful decision to establish a methamphetamine lab or marijuana business in order to further his standing with the Texas Syndicate gang; his conduct in prison and at a pretrial hearing; his own testimony coupled with documents describing his enjoyment of various leisure activities; and his preference for earning money selling drugs, coupled with past legitimate employment including as a barber and assembly line worker.

The state habeas court next considered evidence concerning the seven "*Briseno* factors," which Texas factfinders may focus upon "in weighing evidence as indicative of [intellectual disability] or of a personality disorder." *Ex parte Briseno*, 135 S.W.3d at 8-9. These factors help to explain how subaverage intellectual functioning interacts with limitations in adaptive functioning in order to make the required showing "that the two are linked— the adaptive limitations must be related to a deficit in intellectual functioning and not a personality disorder." *Ex parte Hearn*, 310 S.W.3d at 428-29.

11

No. 15-70017

Based on all of this evidence, the state habeas court found "that there is no credible evidence of [intellectual disability] and no credible basis for believing that [Martinez] is a[n intellectually disabled] person in terms of the prevailing diagnostic standards."

Nonetheless, Martinez argues that reasonable jurists could debate whether this determination was unreasonable based on other evidence in the record and his trial counsel's ineffectiveness in failing to investigate further. He relies heavily on one IQ test, administered by the Texas Department of Corrections in 1965 when he was 18, that resulted in a score of 65. *But see Garcia v. Stephens*, 757 F.3d 220, 226 (5th Cir. 2014) (four higher IQ scores undermine accuracy of one lower IQ score). He also points to facts including his repetition of first grade three times and fifth grade once; that he received very little formal education while in juvenile custody; Dr. Lundberg-Love's testimony that he reads at a fourth grade level and has poor logical and abstract thinking; that Texas Department of Corrections reports show the same deficiencies in abstract reasoning and logic; and testimony from his family that he would wake up screaming in the night as a child and also hit himself. He further argues that the state habeas court's decision was an unreasonable application of Supreme Court precedents in *Hall v. Florida*, 134 S. Ct. 1986 (2014) and *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), both of which were decided after the state habeas court's decision. As Martinez sees it, the state habeas court was required to conduct an evidentiary hearing in the face of the conflicting evidence before it.

The district court held that the state court made a reasonable factual determination in light of all of the evidence before it that Martinez is not intellectually disabled. Federal courts must defer to the state court's fact findings. *See Brumfield*, 135 S. Ct. at 2277; *Blue*, 665 F.3d at 654-55. The court also concluded that the state habeas court's decision does not contravene

No. 15-70017

Supreme Court precedents in *Brumfield*—which involved an inmate who met the standard for an *Atkins* evidentiary hearing—or *Hall*—which does not affect Texas's standards for evaluating *Atkins* claims, *see Garcia*, 757 F.3d at 226; *Mays v. Stephens*, 757 F.3d 211, 218-19 (5th Cir. 2014). With this predicate, the district court also rejected Martinez's contention that there is a reasonable probability that, but for his counsel's alleged ineffectiveness in not investigating the claim further, he would have been found ineligible for execution under *Atkins*. *See Mays*, 757 F.3d at 216-17. Reasonable jurists could not find the district court's assessment of the *Atkins*-related constitutional claims debatable or wrong. We therefore deny a COA.

**B**

Martinez also claims that the district court erred by denying funding to develop his *Atkins* claim. *See* 18 U.S.C. § 3599(f). He does not need a COA to appeal this denial, and we review the decision only for abuse of discretion. *See Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005). We have upheld the denial of such funding when (1) a petitioner has failed to supplement his funding request with a viable constitutional claim that is not procedurally barred; (2) the sought-after assistance would only support a meritless claim; or (3) the sought-after assistance would only supplement prior evidence. *See id.* The petitioner must also show that the funding is "reasonably necessary," which means that there must be a "substantial need" for the requested assistance. *See Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004).

Martinez again relies on the IQ score of 65 when he was 18, and contends that an expert is needed to reconcile it with his higher subsequent results. The district court properly limited its review to the record compiled in the state habeas court, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011); *Ward v. Stephens*, 777 F.3d 250, 266 n.5 (5th Cir. 2015). The court determined that Martinez had not demonstrated why additional testing to supplement that

13

already substantial record was reasonably necessary given the narrow federal standard of review.  Moreover, the state habeas court had allocated $5,000 to develop Martinez's claim, only to have that expert determine he was not intellectually disabled.  Further, Martinez was given an evidentiary hearing on a related neurological impairment claim in an earlier round of federal habeas review, and the testing for that claim led to an IQ test result of 107. *See Martinez v. Dretke*, 404 F.3d at 883, 883 n.6.  Any additional factual development on Martinez's intellectual disability claim would be at best cumulative*, see Smith*, 422 F.3d at 288-89; *Barraza v. Cockrell*, 330 F.3d 349, 352 (5th Cir. 2003), or more likely would support only a meritless claim, *see Allen v. Stephens*, 805 F.3d 617, 638 (5th Cir. 2015); *Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000).  *See also Ward*, 777 F.3d at 266-67.  The district court did not abuse its discretion to deny funds.

## IV

### A

Martinez raises four ineffective assistance of trial counsel claims that he did not exhaust in state court.  These unexhausted claims are therefore procedurally barred under Texas law, *see Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013), and 28 U.S.C. § 2254(b) prevents a federal court from granting habeas relief unless the applicant makes one of two showings, neither of which applies.

Procedurally defaulted claims can, however, be reviewed when "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991).  Ineffectiveness of state habeas counsel is now a circumstance in which a prisoner may show cause for procedural default of a federal claim. *See Martinez v. Ryan*, 132 S. Ct.

1309, 1320 (2012).  The Supreme Court has explicitly made this rule applicable to Texas.  *Trevino v. Thaler*, 133 S. Ct. 1911, 1915 (2013).  "[T]o succeed in establishing cause, the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) (citing *Martinez*, 132 S. Ct. at 1318).

An ineffectiveness claim, in turn, requires the petitioner to make two showings:  (1) counsel's performance was deficient, and  (2) the deficient performance prejudiced the petitioner.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).  Failure to make either showing defeats an ineffectiveness claim.  *See id.*

Where, as here, a federal habeas petitioner brings a claim of ineffective assistance of trial counsel, *and* that claim is procedurally defaulted, *and* he asserts *Martinez*/*Trevino* to show cause for that procedural default, a court must potentially perform two *Strickland* inquiries before considering the underlying defaulted claim.  *See Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014) (performing alternative analyses).  First, the petitioner must demonstrate that the underlying ineffective assistance of *trial* counsel claim is substantial—*i.e.*, has some merit.  *Strickland*'s prejudice prong in a death penalty sentencing case requires a showing that there is a "reasonable probability that the jury would not have imposed the death sentence in the absence of errors by [trial] counsel." *Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) (quotations and citations omitted).  Second, the *Strickland* inquiry also governs whether state *habeas* counsel was ineffective in failing to present the trial court ineffectiveness claim in the state habeas proceeding.  *See Martinez*, 132 S. Ct. at 1318.  Prejudice in this inquiry means that Martinez must show a reasonable probability that he would have been granted state

habeas relief had his habeas counsel's performance not been deficient. *See Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014). Upon satisfying both prongs of this *Martinez/Trevino* inquiry, a petitioner has shown cause for the procedural default and is entitled to have his claim reviewed on the merits in federal court, *see Newbury*, 756 F.3d at 872; but even then, he is not necessarily entitled to habeas relief, *see Martinez*, 132 S. Ct. at 1320.

With these standards in mind, and the COA standards layered on top, we proceed to Martinez's defaulted claims.

## B. Confrontation Clause

The prosecution introduced evidence at Martinez's 2009 sentencing trial that he was responsible for the deaths of five people during his July 1983 crime spree: Herman Chavis, Moses Mendez, Julia Gonzales, Guillermo Chavez, and Traci Pelkey. He had only been convicted of the murder of Chavis, yet the prosecution sought to demonstrate his future dangerousness through evidence of the other killings. A finding of future dangerousness is necessary for the imposition of the death penalty under Texas law. *See* TEX. CODE OF CRIM. PROC. ANN. art 37.071 § 2(b)(1). In addition to live testimony tying Martinez to the murders, the prosecution introduced autopsy reports performed in the four extraneous homicides. The prosecution also called Albert Chu, an assistant medical examiner at the Harris County Medical Examiner's Office, to testify about the reports. Chu had neither performed the autopsies twenty-six years earlier nor witnessed them. Martinez asserts that admission of the autopsy reports and admission of Chu's testimony were each a violation of his Confrontation Clause rights, *see* U.S. CONST. amend. VI, and that his trial counsel were ineffective for not objecting to their admission.

16

No. 15-70017

The district court held that Martinez could not overcome the procedural bar on these claims[3] because he had not shown a reasonable probability of a different result had trial counsel lodged a Confrontation Clause objection. *Martinez v. Stephens*, 2015 WL 1282199 at *11. The court carefully chronicled the status of the Confrontation Clause law in Texas at the time of the 2009 sentencing trial and when his state habeas petition was filed in 2010, and concluded that Martinez had "not raised a strong claim of ineffective representation by trial or habeas counsel." *Id.* It went on to hold that even if his attorneys should have raised the claims, he could not show actual prejudice because removal of the autopsy evidence "would not significantly alter the jury's consideration of Martinez's sentence" given the other evidence tying him to the killings. *Id.*

We agree that Confrontation Clause jurisprudence relating to autopsy reports was unclear in 2009 and 2010 (and remains so today). Because jurists of reason could find it debatable whether the district court's procedural bar ruling was correct, we granted a COA on these two claims.[4] We therefore conduct *de novo Martinez/Trevino* procedural analysis. *See Gonzalez v. Thaler*, 623 F.3d 222, 224 (5th Cir. 2010) (COA granted to review procedural grounds and then stating "[w]e review the denial of a federal habeas petition on procedural grounds *de novo*"), *aff'd*, 132 S. Ct. 641 (2012). Were we to find cause under that doctrine for the procedural default of these claims, we could then consider them on the merits and possibly grant habeas relief. *See*

---

[3] Again, these are two distinct claims. We, like the district court, analyze them together because of the overriding question of prejudice.

[4] The district court alternatively ruled that even if Martinez could overcome the procedural bar on his claims, the claims lack merit; for the same reason that state habeas counsel did not provide deficient performance, trial counsel's failure to object did not amount to constitutionally inadequate representation, but in any case Martinez could not show prejudice. *Martinez v. Stephens*, 2015 WL 1282199 at *16.

17

No. 15-70017

*Martinez*, 132 S. Ct. at 1318.  On close review, however, we agree with the district court that, even assuming Martinez could show that either his trial or habeas counsel was ineffective, he cannot show resultant prejudice.  As a result, his claims are procedurally barred and we must deny habeas relief.

We may assume, without deciding, that Martinez's trial counsel were ineffective for failing to object on either Confrontation Clause ground and that his state habeas counsel was ineffective for failing to object to his trial counsel's ineffectiveness.[5]  But on the ultimate merits of his claim, Martinez must still establish prejudice.  "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111, 131 S. Ct. 770, 791 (2011).  Rather, "[t]he likelihood of a different result must be substantial, not just conceivable."

---

[5] Though we need not decide ineffectiveness, we are skeptical Martinez could establish it as to trial or habeas counsel.  At the time of his 2009 sentencing trial, the Supreme Court had decided *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), which held that admission of testimonial statements against a criminal defendant violates the Confrontation Clause unless the witness is unavailable and was subject to a prior cross-examination.  It reaffirmed and clarified that decision in *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266 (2006).  The Texas courts had by that time applied these decisions to prison disciplinary reports in a capital case.  *See Russeau v. State*, 171 S.W.3d 871, 880-81 (Tex. Crim. App. 2005).  From just these three cases, it is hard to see how Martinez's trial counsel should have found an obligation to object to the autopsy evidence admitted in his trial.  During the pendency of Martinez's direct appeal, and by the time of his 2010 state habeas petition, the Supreme Court had extended *Crawford* to cover "testimonial" certificates of analysis sworn by analysts at a state laboratory in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527 (2009).  The district court recognized that courts have been split on whether *Melendez-Diaz* applies to autopsy reports.  *See Martinez v. Stephens*, 2015 WL 1282199 at *10 to *11.  It also noted that some Texas courts, in cases decided after Martinez's 2009 trial, have held autopsy reports are testimonial at least for some purposes.  *See id.*  Martinez relies heavily on cases decided after his 2009 trial and 2010 habeas petition—most notably *Burch v. State*, 401 S.W.3d 634 (Tex. Crim. App. 2013) (lab reports indicating substance was cocaine are testimonial)—but his reliance is misplaced.  We look to the law at the time of counsel's allegedly deficient conduct, *see United States v. Webster*, 392 F.3d 787, 796 (5th Cir. 2004), and counsel has no duty to anticipate changes in the law, *see United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009).

18

*Id.* at 112, 792.   Martinez simply cannot establish prejudice given the overwhelming evidence of his dangerousness.

First, the autopsy evidence was not the only evidence that linked Martinez to the extraneous killings.  Mary Salazar, the teenage runaway, was present for each of the five murders and personally witnessed those of his sister Julia Gonzales,[6] her boyfriend Guillermo Chavez, and prostitute Traci Pelkey. She testified about how Martinez bragged about each of the killings.  Other witnesses identified Martinez as a robber of the saloons and placed him at the scene of the murders of Herman Chavis and Moses Mendez, even if they could not say definitively that he fired the fatal shots.  Martinez's argument that the prosecution would not have been able to tie the five murders to him without the autopsy evidence is simply not true.

Second, in addition to the 1983 crime spree, the prosecution still had a compelling capital case to present to the jury.  Martinez's criminal history is long and riddled with violence.   From the time he was fifteen years old Martinez has demonstrated his violent proclivities.  This includes: numerous armed robberies; assaults; burglaries; rapes in and out of prison (including of a twelve-year-old girl); killings while setting up his drug business for the Texas Syndicate; his overall gang involvement (including as a leader in the Texas Syndicate); the terror he directed toward his family with regularity; and his brutality toward prison guards and other inmates while in custody. Throughout his lifelong criminal history, Martinez demonstrated no willingness to reform, despite being given multiple opportunities to do so.  He regularly bragged about his criminal exploits and described himself as a "psychopath" to his family.

---

[6] Further, Martinez's niece, Escoto, testified that he claimed to have "killed the wrong sister" on one occasion and apologized to her for killing Gonzales (her mom) on another.

19

No. 15-70017

In sum, Martinez cannot establish a reasonable likelihood that the jury would have found he was not a future danger and spared his life. Any Confrontation Clause error here was harmless because it did not have a substantial and injurious effect or influence in determining the jury's verdict.[7] *See Dorsey v. Stephens*, 720 F.3d 309, 318-19 (5th Cir. 2013); *Clark v. Epps*, 359 F. App'x 481, 485-87 (5th Cir. 2009).

We reached a similar conclusion when Martinez was last before us on his first round of federal habeas review:

> In addition to mitigating evidence presented by the defense, the jury also had before it evidence of Martinez's methodical planning and execution of the crime of conviction. The state propounded evidence that Martinez and his accomplices "cased" Chavis's bar in preparation for the robbery. On July 11 and July 12, 1983, Martinez and one accomplice entered the bar, ordered a beer, drank very little, and left. Martinez and two accomplices returned on July 13, 1983, and shot and killed Chavis in the process of robbing the bar. The jury also had before it evidence of Martinez's subsequent violent and murderous 1983 crime spree, and his numerous prior convictions for burglary, robbery, jail-breaking, and theft. *The evidence depicted a man capable of planning and executing criminal acts and victimizing anyone who would get in his way*, which was more than sufficient to belie any "tragic impulse" defense that Martinez could have asserted.

*Martinez v. Dretke*, 404 F.3d at 890 (emphasis added). The 2009 sentencing jury had the same evidence before it.

---

[7] Martinez argues that the state has the burden of proving that the error is harmless beyond a reasonable doubt. *See United States v. Alvarado-Valdez*, 521 F.3d 337, 341-42 (5th Cir. 2008). That is the correct standard on direct review, but the substantial and injurious effect standard is applied on collateral review. *See Fratta v. Quarterman*, 536 F.3d 485, 507-508 (5th Cir. 2008).

No. 15-70017

Given the state's compelling case for the death penalty, we cannot find that Martinez was prejudiced by his counsels' alleged (and only assumed *arguendo*) ineffectiveness. He has not shown cause under *Martinez/Trevino* for his procedural default of his two Confrontation Clause claims, which are therefore barred from federal review.

## C. Organic Brain Damage

Martinez alleges that his trial counsel were constitutionally ineffective for failing to present evidence of his organic brain damage. We considered and rejected an identical claim in Martinez's first round of habeas proceedings, although we granted him a COA on the issue. *See Martinez v. Dretke*, 404 F.3d at 887-90. We held that "counsel's decision not to introduce evidence of neurological impairment (i.e., organic brain damage) as mitigating evidence at the punishment phase constituted reasonable and protected professional judgment" because evidence of organic brain injury is a "double-edged sword." *Id.* at 889; *see also Kitchens v. Johnson*, 190 F.3d 698, 702-03 (5th Cir. 1999). "[I]ntroduction of evidence that Martinez suffered from organic (i.e., permanent) brain damage, which is associated with poor impulse control and a violent propensity, would have . . . increased the likelihood of a future dangerous finding" that is necessary for the imposition of the death penalty under Texas law, *see* TEX. CODE OF CRIM. PROC. ANN. art 37.071 § 2(b)(1). As a result, "counsel's decision not to introduce evidence of organic brain damage, given the availability of other, less damaging, mitigating evidence, fell within the bounds of sound trial strategy." *Martinez v. Dretke*, 404 F.3d at 890. We further held that even if counsel's strategies did fall below professional norms, they could not form the basis of an ineffective assistance of counsel claim because Martinez could not show prejudice.

Martinez has not demonstrated that his claim is any more meritorious now than it was then. All of the evidence he now presses in support of this

claim was developed during the prior round of habeas review and was available to his trial counsel at his 2009 resentencing. *See id.* at 889 ("Under the facts as they existed at the time [in 2009], counsel's decision was reasonable."). The law did not change between our 2005 opinion and his 2009 sentencing hearing; the second edge of the double-edged sword remains as sharp as ever. Evidence of organic brain damage could have been just as damaging to Martinez as beneficial. Martinez argues that the second edge of the sword was already before the jury, via the testimony of Dr. Lundberg-Love, and therefore not a risk to be concerned with. She testified that he had difficulty controlling his behavior and was impulsive. This does not negate the risk associated with evidence of organic brain damage that his counsel made a strategic decision to avoid. General statements about impulsiveness do not reduce the value of specific, non-cumulative testimony regarding the aggression and permanence of behavior associated with organic brain damage. There is no basis to second-guess his counsel's strategic decision, particularly in light of our prior opinion. Moreover, along the lines already discussed, even if his counsels' performance was ineffective he cannot show prejudice to the outcome of his sentencing retrial. *See also id.* at 890.

Martinez has not demonstrated that his underlying ineffectiveness claim has some merit, and has accordingly not cleared the *Martinez/Trevino* exception to the procedural bar on this claim. Jurists of reason would not find the correctness of the district court's procedural ruling debatable, nor could they find that Martinez's petition states a valid claim of a denial of a constitutional right. We therefore deny a COA on this issue. *See Beatty v. Stephens*, 759 F.3d 455, 466 (5th Cir. 2014) (denying COA on insubstantial claim as procedurally barred).

No. 15-70017

## D

Martinez argues that his trial counsel were constitutionally ineffective for failing to object to allegedly improper prosecution questions regarding his homosexual activity. He claims these questions were designed to prejudice the jury and deny him a fair trial. He protests five references.

First, the prosecution questioned Mary Salazar about why she ran away from home at young age. During that line of questioning, she testified that she met a man in Fort Worth who "had a relationship" with Martinez, without further elaboration.

Second, during cross-examination of Martinez's expert, Dr. Lundberg-Love, the prosecution pointed out that homosexuality had previously been classified by the psychological profession as a mental disorder. This statement was made in the context of her discussion of changes made in the profession's diagnostic manual during Martinez's long history of repeated mental health evaluations. She also identified other changes such as mathematic disorder, male erectile disorder, and caffeine induced disorder, but made clear that these did not represent her diagnosis of Martinez.

Third, also during cross-examination of Dr. Lundberg-Love, the prosecution used juvenile disciplinary records to emphasize Martinez's acts of misconduct during his years of incarceration. While reviewing those records, the prosecution mentioned that the reports included "infraction of rules, details of escapes, attempted escapes, homosexual acts, use of drugs, [and] security treatment for mass escape involvement."

Fourth, the prosecution elicited testimony from Martinez's niece, Laura Escoto, about his criminal history. Asked whether she had seen Martinez with another man, she replied that she had seen him and a man named Casey "together, gay." Defense counsel immediately objected, to which the prosecutor responded that it was being offered as proof of a past "bad act" since Martinez

was "[c]omitting a crime in front of her."[8]  The prosecutor nonetheless conceded that "it was not something that [he had] to put in," and the trial judge instructed the jury to disregard the answer.

Fifth, homosexuality was broached again during Escoto's testimony when the prosecution questioned her about the contents of a letter she had received from Martinez.  In the letter, which was introduced to the jury in its entirety, Martinez wrote in "very" explicit detail about "consensual sex" with a twelve-year-old girl that resulted in his juvenile incarceration.  After discussing the contents of the letter with her, the prosecutor asked Escoto if Martinez had "discussed any sex acts he had in prison."  She responded that he said that "he would force the prisoner for sex. . . . He would hold the knife up to [the other prisoners'] neck and then he would tell them that blood on [his] knife or shit on [his] ding-a-ling."  The prosecutor repeated this testimony during his closing argument while summarizing Martinez's significant criminal history and emphasizing his future dangerousness.

We agree with the district court that "[f]or the most part, the State's questions about Martinez's homosexuality were accurate, in light of the evidence, and were relevant to the State's case."  *Martinez v. Stephens*, 2015 WL 1282199 at *15.  The first question from his ex-girlfriend did not discuss or mention Martinez's sexuality, and the comment was quite minor.  The second question during Dr. Lundberg-Love's cross-examination provided context for the jury to understand the psychological profession's evolving classification of mental disorders.  The third brief mention of homosexuality was actually related to Martinez's criminal history, which is relevant to the future dangerousness special issue.  Such is also the case with regard to

---

[8] Committing a homosexual act was a crime in Texas until 2003.  *See Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472 (2003).

No. 15-70017

Escoto's testimony (and the prosecution's repetition of it) regarding homosexual prison rape, for which Martinez had a standard operating procedure and catchphrase. During Escoto's testimony, Martinez's counsel did object to the most objectionable prosecution question regarding Martinez's homosexual acts. The prosecutor withdrew the question and the trial judge instructed the jury to disregard the comment. Jurors are presumed to follow their instructions, *see Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 1709 (1987), and there is no reason to believe they did not in this case. Moreover, even if it could be said that Martinez's trial counsel should have objected to the other testimony, we also agree with the district court that he cannot establish prejudice given that the evidence established that he was a violent sexual criminal, regardless of where he was or how old he was. *See Martinez v. Stephens*, 2015 WL 1282199 at \*15.

The district court's procedural ruling was that "[t]he comments were an incidental and sporadic factor in the punishment phase and not a decisive consideration in the jury's decision making," state habeas counsel was accordingly not ineffective for failing to raise the claim, and Martinez had therefore not overcome the procedural bar against considering this claim. *Id.* Because reasonable jurists would not find the correctness of this procedural ruling debatable, nor could they find that Martinez's petition states a valid claim of a denial of a constitutional right, we deny a COA on this issue. *See Beatty v. Stephens*, 759 F.3d 455, 466 (5th Cir. 2014) (denying COA on insubstantial claim as procedurally barred).

## V

Based on the foregoing discussion, Martinez's motion for COA is **GRANTED IN PART, DENIED IN PART**; and the judgment of the district court denying habeas relief and denying funding is **AFFIRMED**.